JOURNAL ENTRY and OPINION
{¶ 1} In this appeal, appellant Devin Conner appeals his conviction and assigns eight errors for our review.[1]
 {¶ 2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.
 {¶ 3} We recognize that Conner's briefs dealt with both of his appealed cases. However, at oral argument we addressed only the case dealing with possession of marijuana and possession of drugs for sale. The second case, dealing with fleeing and eluding, will be heard at a later date.
 {¶ 4} On July 3, 2001, the Cuyahoga County Grand Jury indicted Conner for possession of marijuana and for preparation of drugs for sale. At his arraignment, Conner pled not guilty to both charges and the matter proceeded to trial. Prior to trial, on March 4, 2003, Conner filed a motion to suppress evidence seized during an inventory search of his vehicle. The trial court held a hearing on the motion.
 {¶ 5} At the hearing, Deborah Harrison of the Cleveland Police Department testified that she is assigned to the Drug Enforcement Agency ("DEA") task force. Her duties include transportation interdiction at the Cleveland Hopkins International Airport, Amtrak train station, and the Greyhound bus station.
 {¶ 6} According to Harrison, on May 30, 2001, at approximately 10:30 a.m., her department received information from Detective Frank Hubert of the Burbank, California DEA Airport Group, regarding a possible drug courier traveling aboard Southwest Airlines from Burbank to Las Vegas and then to Cleveland. Hubert informed Harrison that the suspect, Jesse Goodwin, was scheduled to arrive on Southwest flight number 1601 at 6:20 p.m. that evening. Hubert described the suspected courier as a black male, mid-to-late fifties, bald, approximately six feet tall, wearing a grey suit and a red tie. Further, the individual had checked two new pieces of luggage that appeared to have marijuana residue on the outside.
 {¶ 7} Harrison verified that Goodwin was on the Southwest Airlines flight from Las Vegas. She and other DEA agents then prepared to meet the flight. A canine unit was brought to the airport and stationed in the back with the baggage handlers while other DEA members monitored the arrival gate.
 {¶ 8} When the flight arrived, Goodwin deplaned, and Harrison proceeded to follow him to the baggage claim area. Detective Gilchrist informed her over the radio that the drug-sniffing dog had "alerted" to both bags for the odor of narcotics. Upon reaching the baggage claim area, Goodwin was met by an individual, later identified as Conner. The two men shook hands and each retrieved one bag from the baggage claim carousel.
 {¶ 9} As Goodwin and Conner walked away from the carousel, Harrison approached Goodwin and Special Agent Johns approached Conner. The agents identified themselves and asked to speak with the men. Harrison asked Goodwin for identification, and he produced an Ohio driver's license. When asked for his airline ticket, Goodwin produced a Southwest Airlines ticket folder with two baggage claim checks and a Rapid Reward Passenger Receipt coupon attached. Agent Johns asked Conner if he was traveling that day. Conner responded that he was not, but was there to pick up his uncle. Harrison then asked Goodwin if Conner was his nephew and he said he was. As a result of questioning by the agents, Goodwin also admitted the two bags were his and allowed the agents to search the bags. Detective Stirling attempted to open the luggage but was unable to because they were locked. Goodwin informed him he did not have the keys to the bags. Suspicious, Harrison asked Goodwin if he had packed the bags, to which he responded he did. Harrison then asked Goodwin if he was sure the bags were his, and he again confirmed they were his bags. When Harrison, however, asked Goodwin a second time who had packed his bags, he refused to answer, but kept looking at Conner.
 {¶ 10} At this time, Conner, who had been talking to Detective Johns, told Goodwin he did not have to let the officers search the bags. Conner then asked Harrison if she had a search warrant, and she admitted she did not. Harrison asked Goodwin if he was withdrawing his consent for the officers to search his bags, and he said he was. Thereafter, Harrison advised Goodwin that he would be detained until the officers obtained a search warrant.
 {¶ 11} After approximately two hours, a search warrant was obtained. Upon searching the bags, the officers discovered fifty pounds of marijuana. Goodwin and Conner were subsequently arrested. The police learned that Conner arrived at the airport in a rental car which was illegally parked in front of the arrival area. The car was subsequently towed, and an inventory search of the vehicle revealed a small amount of marijuana, photographs, a cellular phone, and miscellaneous personal papers.
 {¶ 12} The trial court denied the motion to suppress, and the matter proceeded to trial. However, the trial ended in a hung jury. On April 22, 2003, a subsequent trial began, which also ended in a hung jury. On September 16, 2003, a third trial commenced.
 {¶ 13} Jesse Goodwin testified in May 2001, his nephew, Devin Conner, approached him and proposed that he travel to California to pick up a package of marijuana. Conner offered to pay him $1,000, plus his traveling expenses. Goodwin agreed to travel to California to pickup the drugs because Conner assured him if he got caught he would only receive probation. Consequently, Goodwin flew to California, picked up the marijuana, and returned to Cleveland, where he was subsequently arrested by the DEA interdiction unit.
 {¶ 14} Thereafter, Goodwin entered into a plea agreement with the State whereby he agreed to testify against Conner. Goodwin was ultimately sentenced to five years probation.
 {¶ 15} Detective Harrison's testimony at trial echoed her testimony at the suppression hearing. Several members of the DEA task force and the Cleveland Police Department testified consistently with Harrison's testimony.
 {¶ 16} The jury found Conner guilty of possession of marijuana and preparation of marijuana for sale. On December 8, 2003, the trial court sentenced Conner to a prison term of eight years. Conner now appeals.
 {¶ 17} In his first assigned error, Conner argues the prosecutor peremptorily challenged an African-American juror because of her race in violation of the Equal Protection Clause. We disagree.
 {¶ 18} The venire in the instant case contained two members of the African-American community. The trial court excused the first African-American member after she disclosed she knew Conner. She stated she went to middle school with Conner, and they were casual friends. Thereafter, the following discussion took place:
"The Court: Excuse me, let me just jump in here. Have you formed anopinion one way or the other? I don't want you to express it, other thanto tell us whether you've formed an opinion as to Mr. Conner's characteror credibility?
 Ms. Doss: Probably, yes. I have to be honest and say yes.
 The Court: Okay. Then you can't serve."[2]
 {¶ 19} Following the above discussion, Conner's defense counsel advised the trial court that if the State of Ohio excused the other African-American juror, he would consider raising a Batson[3]
challenge. Thereafter, the following exchange took place:
"The Court: Counsel, this does not raise a Batson issue because no onehas moved to excuse her. The Court is excusing her for this very reason.
 Mr. Goins: I understand. I'm saying down the road, not now. The Court:The record should reflect that she is one of two African-Americans, andthat's unfortunate. But she came in here having known this individual,and having formed an opinion so she can't serve, all right? Let'sproceed."[4]
 {¶ 20} The State subsequently peremptorily challenged the remaining African-American juror; defense counsel made a Batson objection, which was overruled by the trial court.
 {¶ 21} In order to state a prima facie case of purposeful discrimination under Batson v. Kentucky,[5] an accused must demonstrate: (1) that members of a recognized racial group were peremptorily challenged; and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the jurors on account of their race.[6]
 {¶ 22} If the accused makes a prima facie case of discrimination, the State must then come forward with a neutral explanation.[7] As set forth in Batson:
 {¶ 23} "Once the defendant makes a prima facie showing, the burdenshifts to the State to come forward with a neutral explanation forchallenging black jurors. Though this requirement imposes a limitation insome cases on the full peremptory character of the historic challenge, weemphasize that the prosecutor's explanation need not rise to the leveljustifying exercise of a challenge for cause. See McCray v. Abrams [C.A.2, 1984], 750 F.2d 1113, at 1132; Booker v. Jabe,(C.A. 6, 1985), 775 F.2d 762, 773, cert. pending, No. 85-1028, certiorarigranted and judgment vacated (1986), 478 U.S. 1001. But the prosecutormay not rebut the defendant's prima facie case of discrimination bystating merely that he challenged jurors of the defendant's race on theassumption — or his intuitive judgment — `that they would be partial tothe defendant because of their shared race. * * * Nor may the prosecutorrebut the defendant's case merely by denying that he had a discriminatorymotive or `[affirming] [his] good faith in making individualselections'. Alexander v. Louisiana (1972), 405 U.S. 625, at 632,92 S.Ct. 1221, 31 L.Ed.2d 536. If these general assertions were acceptedas rebutting a defendant's prima facie case, the Equal Protection Clause`would be but a vain and illusory requirement'. Norris v. Alabama,(1935), 294 U.S. 587, 79 L.Ed. 1074, 55 S.Ct. 579, at 598. The prosecutortherefore must articulate a neutral explanation related to the particularcase to be tried. The trial court then will have the duty to determine ifthe defendant has established purposeful discrimination."[8]
 {¶ 24} Once a race-neutral explanation for the peremptory challenge has been offered, and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether a prima facie showing has been made becomes moot.[9]
 {¶ 25} Whenever a party opposes a peremptory challenge by claiming racial discrimination, the duty of the trial court is to decide whether granting the strike will contaminate jury selection through unconstitutional means.[10] The inquiry, therefore, is whether the trial court's analysis of the contested peremptory strike was sufficient to preserve a constitutionally permissible jury-selection process.[11]
A trial court's finding of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous.[12] The trial court, in supervising voir dire, is best equipped to resolve discrimination claims in jury selection, because those issues turn largely on evaluations of credibility.[13]
 {¶ 26} With these principles clearly in mind, we turn our attention to the conduct of the proceedings in the present case. The record reveals the State requested a sidebar conference prior to the exercise of this peremptory challenge and in the ensuing conversation, the following exchange took place:
"Ms. Hilow: Your Honor, juror number 7, Jamila Martin, when I wasquestioning her, she indicated that she finds fault with the system. Shehad some issues as far as reasonable doubt and she indicated she hadrelatives who had been convicted.
 The Court: She didn't have issues.
 Ms. Hilow: Well, when I asked her did she believe the system failed,she said yes, there's evidence but she doesn't think it's beyondreasonable doubt. The State has some concerns about her ability to serveas a fair and impartial juror on this case based on those answers tothose questions about drug charges her relatives faced. She said she satthrough the evidence and her judgment of the evidence was she felt it wasnot beyond a reasonable doubt. When I specifically asked her did thesystem fail, she said yes, it did. It's the same system that we'reoperating under today."[14]
 {¶ 27} Thereafter, defense counsel objected to the impending peremptory challenge by arguing that to allow the strike would result in an all white jury and a black defendant. By requesting a sidebar conference prior to the strike, the State in the case sub judice did not await a determination by the trial court that Conner could establish a prima facie case of discrimination. Accordingly, we will indulge the assumption that a prima facie demonstration of discrimination was made by Conner and proceed to consider the arguments of the State that a race-neutral basis for the exclusion existed.
 {¶ 28} The State contends that it did not excuse Martin on account of her race. Rather, the State contends it harbored doubts concerning Martin's ability to serve as a fair and impartial juror because several family members were convicted of drug offenses. The representations of the State in the present case that other criteria governed its decision are supported by the record. The trial court stated: "This juror did indicate that she felt the system had not served and if I recall correctly, it was plural relatives, so I'm going to permit this peremptory challenge mindful of the fact that she would be the last African-American on the entire venire."[15] While such concerns may or may not be sufficient to exclude Martin for cause, Batson clearly holds that the basis for a peremptory challenge need not rise to this level to avoid the conclusion that such behavior is constitutionally infirm.
 {¶ 29} Our review of the trial court's consideration of the Batson
objection reveals that the court was scrupulously fair to the parties and conscientious in the performance of its duties. Consequently, we cannot conclude that its decision to permit the peremptory challenge was clearly erroneous. Accordingly, we overrule Conner's first assigned error.
 {¶ 30} In his second assigned error, Conner argues the trial court erred in denying his motion to suppress where the government detained him while seeking a search warrant to search Goodwin's luggage. We disagree.
 {¶ 31} An appeal of a trial court's ruling on a motion to suppress evidence involves mixed questions of law and fact. Initially, we note that in a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses.[16] Thus, the credibility of witnesses during a suppression hearing is a matter for the trial court. A reviewing court should not disturb the trial court's findings on the issue of credibility.,[17] Accordingly, in our review we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence.[18]
 {¶ 32} The Fourth and Fourteenth Amendments to the United States Constitution prohibit any governmental search or seizure, including a brief investigative stop, unless supported by an objective justification.[19] Section 14, Article I of the Ohio Constitution protects the same interests in a manner consistent with theFourth Amendment to the United States Constitution.[20]
 {¶ 33} In Terry v. Ohio,[21] the United States Supreme Court held that a police officer may stop and investigate unusual behavior, even without probable cause to arrest, when he reasonably concludes that the individual is engaged in criminal activity. In assessing that conclusion, the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.[22] Furthermore, the standard against which the facts are judged must be an objective one: "[W]ould the facts available to the officer at the moment of the seizure or the search `warrant a man of reasonable caution in the belief' that the action taken was appropriate?"[23]
 {¶ 34} An objective and particularized suspicion that criminal activity was afoot must be based on the entire picture, a totality of the surrounding circumstances.[24] Furthermore, these circumstances are to be viewed through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold.[25]
 {¶ 35} In the instant case, our analysis of the totality of the circumstances begins with the call from the DEA in Burbank, California alerting the Cleveland DEA that Goodwin, a suspected drug courier, was en route to Cleveland. When Goodwin arrived in Cleveland and the drug-sniffing dog "alerted" to the presence of narcotics in his luggage, the police had probable cause to detain Goodwin. Detective Harrison testified that once Goodwin claimed the luggage, he took one bag and Conner the other. Harrison stopped Goodwin while Detective Johns stopped Conner. Harrison stated, in the ensuing conversation, Conner was more interested in her questioning of Goodwin than listening to Detective Johns. After Goodwin initially consented to the bags being searched, Conner told him he did not have to consent unless they had a warrant. Goodwin then withdrew his consent and, as the questioning continued, Goodwin looked at Conner before answering. At one point during the encounter, Goodwin looked totally puzzled. Conner's behavior led her to believe that he knew what was in the luggage.
 {¶ 36} The Fourth Amendment does not require a police officer who lacks the precise level of information necessary for probable cause for arrest to simply shrug her shoulders and allow a crime to occur or a criminal to escape. On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response.[26] In this case, detaining Conner while the police secured a warrant to search Goodwin's luggage, was reasonable. The trial court properly denied the motion to suppress. Accordingly, Conner's second assigned error is overruled.
 {¶ 37} In his third assigned error, Conner argues the trial court erred in permitting "other acts" testimony to be presented to the jury. We disagree.
 {¶ 38} The trial court has broad discretion in the admission of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, [an appellate] court should be slow to interfere.[27] To constitute an abuse of discretion, a trial court's action must be arbitrary, unreasonable, or unconscionable.[28] However, where the trial court completely misconstrues the letter and spirit of the law, it is clear that the trial court has been unreasonable and has abused its discretion.[29]
Moreover, a new trial should not be granted unless the accused was prejudiced or may have been prejudiced by the evidence improperly admitted.[30]
 {¶ 39} Generally, evidence of prior criminal acts, wholly independent of the crime for which defendant is on trial, is inadmissible.[31]
R.C. 2945.59 codifies the exceptions to this rule, providing:
 {¶ 40} "In any criminal case in which the defendant's motive orintent, the absence of mistake or accident on his part, or thedefendant's scheme, plan, or system in doing an act is material, any actsof the defendant which tend to show his motive or intent, the absence ofmistake or accident on his part, or the defendant's scheme, plan, orsystem in doing the act in question may be proved, whether they arecontemporaneous with or prior or subsequent thereto, notwithstanding thatsuch proof may show or tend to show the commission of another crime bythe defendant."
 {¶ 41} Evid.R. 404(B) states that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 {¶ 42} Evid.R. 404(B) is in accord with R.C. 2945.59.[32] Hence, it is necessary to determine whether any of the matters enumerated in R.C.2945.59 were relevant at trial and, if so, whether the testimony that the prosecution elicited regarding other acts of the defendant tended to prove the relevant enumerated matter.[33]
 {¶ 43} Conner argues the trial court allowed the State to introduce and argue three incidents of other acts testimony. First, DEA agent, Lane Williams testified about an unrelated drug arrest in California, where Richard McMillan, a drug courier, was carrying a receipt that contained Conner's name and signature. Second, an employee of Southwest Airlines testified that Conner took advantage of the airline's Rapid Rewards frequent flyer program when he previously flew to California. Third, the State was repeatedly permitted to elicit testimony that Rapid Rewards coupons are commonly used by drug couriers.
 {¶ 44} The State asserted at trial that the above prior acts testimony was relevant to show a common scheme, lack of mistake, or intent. The State's asserted basis for admissibility is on point. The record reveals that three months prior to Conner's arrest, the California DEA arrested Richard McMillan, a drug courier, in California prior to his boarding a Southwest Airlines flight to Cleveland. The DEA discovered approximately forty pounds of marijuana in McMillan's luggage. When searched, McMillan had a receipt from a Comfort Inn and Suites in Los Angeles. The receipt listed Conner as a guest, staying for two nights, from February 24 through February 26, 2001. The receipt also reflected that Conner's credit card was billed for the charges. Additionally, at the time of McMillan's arrest, he was attempting to fly utilizing a Southwest Airlines Rapid Rewards certificate.
 {¶ 45} Here, the other acts evidence in the case established a modus operandi that shared common features with the crimes for which Conner was presently charged. First, both Goodwin and McMillan traveled using Southwest Airlines Rapid Rewards certificates. Second, as evidenced from the hotel receipt seized from McMillan and Goodwin's testimony that Conner gave him cash to pay for his hotel stay, there is an indication Conner paid for both couriers' lodging. Third, the marijuana recovered from the luggage of both McMillan and Goodwin was packaged in identical food saver bags. When Conner was arrested, the detective recovered a Wal-Mart receipt and corresponding credit card receipt dated February 25, 2001, for the purchase of a vacuum sealer kit and food saver bags.
 {¶ 46} It is clear from the foregoing that there is a consistent pattern of behavior between the two arrests. The pattern of travel and of packaging is significant because it established that Conner utilized the same methods in both instances. Therefore, this evidence meets the statutory exception for permitting other acts testimony to prove the defendant's "scheme, plan or system in doing the act in question."[34]
 {¶ 47} Further, the trial court's limiting instruction was sufficient to cure any error, which might have occurred in admitting the evidence of prior acts. In permitting the other acts evidence, the trial court justified its ruling as follows:
"I have permitted the introduction of other acts evidence in thiscase. I have determined, as I have explained to counsel, that the otheracts evidence does become relevant in light of the particular manner inwhich the arrest of Mr. McMillan occurred and its great similarity to themanner in which the facts of this particular case unfolded."[35]
 {¶ 48} Moreover, upon consideration of the entire record before us, the admission of the above evidence did not amount to prejudicial error. The balance of the evidence at trial constituted overwhelming evidence of Conner's guilt. Accordingly, we find the error complained of was harmless beyond a reasonable doubt and did not deprive Conner of his constitutional right to a fair trial. Accordingly, Conner's third assigned error is overruled.
 {¶ 49} In the fourth assigned error, Conner argues the underlying convictions are not supported by sufficient evidence. We disagree.
 {¶ 50} The standard of review with regard to the sufficiency of evidence is set forth in State v. Bridgeman:[36]
 "Pursuant to Criminal Rule 29(A), a court shall not order an entry ofjudgment of acquittal if the evidence is such that reasonable minds canreach different conclusions as to whether each material element of acrime has been proved beyond a reasonable doubt."[37]
 {¶ 51} Bridgeman must be interpreted in light of the sufficiency test outlined in State v. Jenks,[38] in which the Ohio Supreme Court held:
"An appellate court's function when reviewing the sufficiency of theevidence to support a criminal conviction is to examine the evidencesubmitted at trial to determine whether such evidence, if believed, wouldconvince the average mind of the defendant's guilt beyond a reasonabledoubt. The relevant inquiry is whether, after viewing the evidence in alight most favorable to the prosecution, any rational trier of fact couldhave found the essential elements of the crime proven beyond a reasonabledoubt. ( Jackson v. Virginia [1979], 443 U.S. 307, 99 S.Ct. 2781,61 L. Ed. 2d 560, followed.)[39]
 {¶ 52} "Although a court of appeals may determine that a judgment of atrial court is sustained by sufficient evidence, that court maynevertheless conclude that the judgment is against the weight of theevidence. * * * Weight of the evidence concerns `the inclination of thegreater amount of credible evidence, offered in a trial, to support oneside of the issue rather than the other. It indicates clearly to the jurythat the party having the burden of proof will be entitled to theirverdict, if, on weighing the evidence in their minds, they shall find thegreater amount of credible evidence sustains the issue which is to beestablished before them. Weight is not a question of mathematics, butdepends on its effect in inducing belief. * * *'"[40]
 {¶ 53} Conner contends the underlying convictions are not supported by sufficient evidence because he merely went to the airport to pick up his uncle. However, it is necessary to look at all the attendant facts and circumstances in order to determine if a defendant knowingly possessed a controlled substance.[41] Possession is defined as having "control over a thing or substance," but it may not be inferred, however, solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."[42]
 {¶ 54} Possession can be actual or constructive.[43] Constructive possession exists when an individual knowingly exercises dominion and control over an object, even though that object may not be within the individual's immediate physical possession.[44] It is not necessary to establish ownership of a controlled substance in order to establish constructive possession.[45] Moreover, proof by circumstantial evidence is sufficient to support constructive possession.[46] As such, readily usable drugs or other contraband in close proximity to a defendant may constitute sufficient and direct circumstantial evidence to support a finding of constructive possession.[47]
 {¶ 55} Here, though Conner contends he was at the airport to pick up his uncle, it is belied by the testimony of the DEA agents trained in parcel drug interdiction and trained to recognize individuals involved in illegal activities. Detective Kirk Johns testified as follows regarding the encounter with Conner:
"Once it became clear to us that he was more concerned with us gettinginto those bags than Mr. Goodwin, myself as well as my other partnersstrongly believed that Mr. Goodwin had no idea what was in those bags andMr. Conner did, and it was for this reason that we detained both ofthem."[48]
 {¶ 56} Moreover, testimony revealed that when Goodwin was being questioned he repeatedly looked in Conner's direction. Goodwin's behavior indicated Conner was in control. It is therefore reasonable for the jury to have concluded that Conner had constructive possession of the drugs confiscated at the airport.
 {¶ 57} With respect to the charge of possession of drugs for sale, an inference may be drawn from the circumstances surrounding the defendant at the time of his arrest and the quantity and character of the narcotics seized at the time. In the instant case, approximately fifty pounds of marijuana was discovered in the two bags. A prudent person could conclude that those narcotics were in his possession for the purpose of sale and not for personal consumption.[49] Therefore, the jury's finding Conner guilty of possession of drugs and possession of drugs for sale was proper. Accordingly, we overrule Conner's fourth assigned error.
 {¶ 58} In his fifth and sixth assigned errors, Conner contends that the imposition of a mandatory eight-year term of incarceration pursuant to R.C. 2925.11(C)(3)(f) was unconstitutional because it violated the doctrine of separation of powers and constituted cruel and unusual punishment. We disagree.
 {¶ 59} The Supreme Court of Ohio has held:
"A punishment does not violate the constitutional prohibition againstcruel and unusual punishments, if it be not so greatly disproportionateto the offense as to shock the sense of justice of the community."[50]
 {¶ 60} In the present case, R.C. 2925.11(C)(3)(f) provides for the maximum penalty for a second degree felony, which is eight years pursuant to R.C. 2929.14(A)(2).
 {¶ 61} R.C. 2925.11(C)(3) sets forth a reasonable progression of harsher sentences for the possession of larger quantities of marijuana. The mandatory eight-year sentence is not disproportionate to other crimes of similar stature, therefore, it does not constitute cruel and unusual punishment. Moreover, the General Assembly has the authority to define criminal conduct and to determine the appropriate punishment.[51]
Mandatory sentencing laws enacted pursuant to this authority do not usurp the judiciary's power to determine the sentence of individual offenders.
 {¶ 62} We also conclude that the trial court's findings for imposing the mandatory sentence were amply supported by the record. The DEA agents recovered approximately fifty pounds of marijuana from the two bags, an amount equal to or exceeding 20,000 grams, a felony of the second degree. Both counts were subject to the mandatory eight-year sentence. The sentence the trial court imposed did not constitute cruel and unusual punishment, nor did it violate the separation of powers doctrine. Accordingly, we overrule Conner's fifth and sixth assigned errors.
 {¶ 63} In his seventh assigned error, Conner contends he was denied due process when the State was allowed to elicit evidence regarding the exercise of his constitutional rights. We disagree.
 {¶ 64} This argument is without merit for the simple reason that Conner had no standing under the Fourth Amendment to challenge the search and seizure that resulted in his arrest for possession of drugs and preparation of drugs for sale. At the time of Conner's detention and subsequent arrest, he was asserting Goodwin's constitutional rights.
 {¶ 65} Standing under the Fourth Amendment is a threshold issue. A criminal defendant must be able to demonstrate that it was his or her constitutional rights that were allegedly violated before a trial court can review the propriety of police conduct at issue. If the defendant cannot satisfy this burden, then he or she cannot invoke the exclusionary rule.
 {¶ 66} Under relevant United States Supreme Court case law, the primary basis for challenging a search is that the defendant had a reasonable expectation of privacy in the premises or area searched.[52]
In the case sub judice, Conner claims he was detained and subsequently arrested because he invoked the constitutional rights of Goodwin. Hence, based on the above case law, Conner had no standing to challenge the search of bags that he has maintained were not his. Accordingly, we overrule Conner's seventh assigned error.
 {¶ 67} In his eighth assigned error, Conner argues the trial court violated the Sixth and Fourteenth Amendments to the United States Constitution, and Article 1, Section 10 of the Ohio Constitution which provide rights to confrontation and cross-examination, and Evid.R. 801 and 802, when it permitted various State witnesses to testify regarding inadmissible hearsay statements. We disagree.
 {¶ 68} The Sixth Amendment's Confrontation Clause provides that, "in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him." The United States Supreme Court has held that this bedrock procedural guarantee applies to both federal and state prosecutions.[53]
 {¶ 69} We note that the right of confrontation requires that whenever possible, testimony and cross-examination should occur at trial. The purpose behind the Confrontation Clause is two-fold: (1) to allow a criminal defendant the right to confront his or her accusing witness face-to-face in open court for truth-testing cross-examinations; and (2) to give the jury an opportunity to judge the credibility of the witness through observation of the witness's demeanor.[54]
 {¶ 70} Conner complains that the trial court allowed hearsay testimony of William Marsden, Lisa Stewart and Detective Lane Williams. We will confine our discussion to the testimony of Marsden and Stewart, because the testimony of Detective Williams was sufficiently dealt with in the third assigned error.
 {¶ 71} William Marsden, Director of Security for MCI Skytel, testified at trial regarding the records pertaining to Conner's pager. Prior to Marsden's testimony, Conner's counsel stipulated that Marsden was keeper of the records and that no foundation was necessary. According to Marsden, on June 1, 2001, an individual who identified himself as Devin Conner, called MCI Skytel to request a replacement pager. After the company verified certain security information about the account, a replacement pager was sent to Devin Conner. Marsden also testified about the record of the messages going to and from Conner's pager from May 29, 2001 through May 30, 2001. He identified an incoming text message at approximately 7:57 p.m. on May 29, 2001. The message stated: "Your uncle has arrived. I'm in room 229, Goodwin, G-O-O-D-W-I-N."[55]
 {¶ 72} A review of the record indicates that Marsden's testimony falls squarely within the business records exception. His testimony did not establish that Conner was the individual who actually called to request a replacement pager, only that someone claiming to be Conner called. Also, his testimony did not establish who sent the text message in question. Further, Conner had the opportunity to confront Marsden at trial, and did so.
 {¶ 73} Lisa Stewart, custodian of records with Southwest Airlines, testified at trial about the airline's policies and procedures. Again, Conner's counsel stipulated and waived the laying of a foundation for this testimony. According to Stewart, she had frequently been called to testify in cases involving drug offenses. Stewart identified a reservation record of a Devin Conner for travel on February 24, 2001, from Cleveland, through Nashville, and to Los Angeles. The reservation record indicated that a Rapid Reward certificate was going to be presented at the time of arrival. The individual, who identified himself as "Devin," gave a call back number of 877-944-0412.
 {¶ 74} Here, the information that Stewart provided was contained in the official records kept in the normal course of business of Southwest Airlines. The information was not hearsay and was properly admitted into evidence.
 {¶ 75} The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversarial proceeding before the trier of fact.[56] The testimony of both Marsden and Stewart was properly admitted as business records; therefore, it did not violate the Confrontation Clause. Accordingly, Conner's eighth assigned error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, J., and Calabrese, Jr., J., Concur.
 APPENDIX Assignment of Errors: First Case
 {¶ 76} "I. The prosecutor peremptory challenged an African-Americanprospective juror because of her race in violation of the equal protectionclause."
 {¶ 77} "II. The trial court erred in denying Mr. Conner's motion tosuppress where the government detained Mr. Conner while the governmentsought a warrant to search Mr. Goodwin's luggage."
 {¶ 78} "III. The trial court erred in permitting `other acts'testimony to be presented to the jury."
 {¶ 79} "IV. The underlying convictions are not supported by sufficientevidence."
 {¶ 80} "V. The imposition of mandatory maximum sentence in the instantcase constitutes cruel and unusual punishment in violation of theEighth Amendment to the United States Constitution."
 {¶ 81} "VI. The mandatory maximum sentence set forth in R.C.2925.11(C)(3)(f) and applied in the instant case violates the separationof powers doctrine."
 {¶ 82} "VII. Mr. Conner was deprived due process of law when thegovernment was permitted to elicit evidence regarding Mr. Conner'sexercise of his constitutional rights."
 {¶ 83} "VIII. The trial court erred in violation of the Sixth andFourteenth Amendments to the United States Constitution, and Article 1,Section 10 of the Ohio Constitution which provide rights to confrontationand cross-examination, and Evidence Rules 801 and 802, when it permittedvarious State witness to testify with inadmissable hearsay statements."
[1] See Appendix.
[2] Tr. at 65-66.
[3] Batson v. Kentucky (1986), 476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712.
[4] Tr. at 68.
[5] (1986), 476 U.S. 79, 90 L.Ed.2d 69, 106 S.Ct. 1712.
[6] State v. Moore (1998), 81 Ohio St.3d 22, 28, 689, citing, State v.Hernandez (1992), 63 Ohio St.3d 577, 582, 589; State v. Hill (1995),73 Ohio St.3d 433, 444-445.
[7] Hill, supra at 445.
[8] Batson, supra at 97-98.
[9] State v. Hernandez, supra at 583, citing Hernandez v. New York
(1991), 500 U.S. 352, 114 L.Ed. 2d 395, 111 S.Ct. 1859.
[10] Hicks v. Westinghouse Materials Co. (1997), 78 Ohio St.3d 95, 99.
[11] Id.
[12] Hernandez, 63 Ohio St.3d at 583.
[13] Hicks, supra at 102, citing, Batson at 98.
[14] Tr. at 100-101.
[15] Tr. at 102.
[16] See State v. Robinson (1994), 98 Ohio App.3d 560; Statev. Rossiter (1993), 88 Ohio App.3d 162; State v. Lewis (1992),78 Ohio App.3d 518; State v. Warren (Aug. 12, 1991), 4th Dist. No. 90CA7.
[17] See State v. Mills (1992), 62 Ohio St.3d 357; State v. Fanning
(1982), 1 Ohio St.3d 19.
[18] See State v. Harris (1994), 98 Ohio App.3d 543.
[19] United States v. Cortez (1981), 449 U.S. 411, 417; Reid v.Georgia (1980), 448 U.S. 438, 440; Terry v. Ohio (1968), 392 U.S. 1, 19.
[20] State v. Lindway (1936), 131 Ohio St. 166; State v. Burkholder
(1984), 12 Ohio St.3d 205.
[21] (1968), 392 U.S. 1.
[22] Id. at 21.
[23] Id. at 21-22.
[24] State v. Bobo (1988), 37 Ohio St.3d 177; United States v. Rickus
(C.A. 3, 1984), 737 F.2d 360, 365.
[25] United States v. Hall (C.A.D.C. 1976), 525 F.2d 857, 859; Statev. Freeman (1980), 64 Ohio St.2d 291, 295.
[26] Adams v. Williams (1972), 407 U.S. 143, 145.
[27] State v. Maurer (1984), 15 Ohio St.3d 239, quoting State v.Hymore (1967), 9 Ohio St.2d 122, 128.
[28] State ex rel. The V Cos. v. Marshall (1998), 81 Ohio St.3d 467,469.
[29] Warner v. Waste Mgt., Inc. (1988), 36 Ohio St.3d 91, 99.
[30] R.C. 2945.83(C).
[31] State v. Thompson (1981), 66 Ohio St.2d 496, 497.
[32] State v. Broom (1988), 40 Ohio St.3d 277, 281.
[33] State v. Curry (1975), 43 Ohio St.2d 66, 70.
[34] R.C. 2945.59.
[35] Tr. at 524.
[36](1978), 55 Ohio St.2d 261, syllabus.
[37] See, also, State v. Apanovitch (1987), 33 Ohio St.3d 19, 23; Statev. Davis (1988), 49 Ohio App.3d 109, 113.
[38] (1991), 61 Ohio St.3d 259.
[39] Id. at paragraph two of the syllabus.
[40] State v. Thompkins (1997), 78 Ohio St.3d 380, 386-87.
[41] State v. Teamer (1998), 82 Ohio St.3d 490, 492.
[42] R.C. 2925.01(K).
[43] See State v. Wolery (1976), 46 Ohio St.2d 316, 329; State v.Haynes (1971), 25 Ohio St.2d 264, 267; State v. Barr (1993),86 Ohio App.3d 227, 235.
[44] State v. Hankerson (1982), 70 Ohio St.2d 87, at the syllabus.
[45] State v. Mann (1993), 93 Ohio App.3d 301, 308.
[46] See State v. Jenks, 61 Ohio St.3d at 272-73.
[47] State v. Pruitt (1984), 18 Ohio App.3d 50, 58; see, also,State v. Scalf (1998), 126 Ohio App.3d 614, 619-620.
[48] Tr. at 434.
[49] State v. Jones (Dec. 26, 1973), 10th App. Dist. No. 73AP-338.
[50] State v. Chaffin (1972), 30 Ohio St.2d 13, paragraph three of the syllabus.
[51] See State v. Thompkins (1996), 75 Ohio St.3d 558, 560.
[52] Rakas v. Illinois (1978), 439 U.S. 128, 58 L.Ed. 2d 387,99 S.Ct. 421.
[53] Crawford v. Washington (2004), 541 U.S. 36, 158 L.Ed. 2d 177,124 S.Ct. 1354, citing Pointer v. Texas (1965), 380 U.S. 400, 406,13 L.Ed. 2d 923, 85 S.Ct. 1065.
[54] Mattox v. United States (1895), 156 U.S. 237, 242-43, 39 L. Ed. 409,15 S.Ct. 337.
[55] Tr. at 250.
[56] Maryland v. Craig (1990), 497 U.S. 836, 845, 111 L.Ed.2d 666, 678,110 S.Ct. 3157.