OPINION
{¶ 1} This appeal arises from the Lake County Court of Common Pleas, wherein appellant, Rhonda C. Head ("Head"), was convicted on two counts of murder, one count of kidnapping, and one count of felonious assault.
 {¶ 2} On June 29, 2001, off-duty Cleveland Police Officer David Stokes discovered a body, later identified as James Beres ("Beres"), in the University Circle area of Cleveland while he was walking his dogs. The body was lying face down, covered in a blanket in a wooded area. Stokes alerted the police, and the body was taken to the coroner's office where an autopsy was performed.
 {¶ 3} The following facts related to Beres's death are relevant to Head's appeal and are derived from the testimony of both Head and Shawn Fisher ("Fisher") at trial. On June 26, 2001, Shawn Hall ("Hall") came to Head's home where she lived with her boyfriend, Ken LaForce ("LaForce"), and her three children. Hall asked LaForce to give him a ride. LaForce refused and asked Head to give Hall the ride. Head and LaForce had been dating for seven years and Head recently became friends with Hall. Head had begun to drive Hall from place to place in exchange for free drugs to support her habit. Head agreed to give Hall a ride in her minivan to the home of Laveda Lyons ("Lyons").
 {¶ 4} Head intended to drop Hall off and return home. However, as she pulled into Lyons's driveway, someone approached Hall and told him that his brother, Brandon Kaseda ("Kaseda") had been "ripped off" by Beres and another individual, Tom Hogya, in a crack cocaine buy. Kaseda had handed the drugs over and the pair quickly drove away without paying. Upon hearing this, Hall asked Head to give him a ride to Prospect Street in Painesville so that he could find Kaseda and find out what happened. They located Kaseda, who informed them that he had been "ripped off" by Beres, who had not paid him for drugs that he purchased from Kaseda. Hall then asked Head to drive him back to Lyons's house.
 {¶ 5} Upon arriving at Lyons's house, Hall was informed that Beres was at the home of Crystal Giddings ("Giddings"). Hall asked Head to go to Giddings's house. He also asked Johnson and Fisher, who were at Lyons's house, to go as well. The group got in the van and headed to Giddings's house. When they arrived at Giddings's house, everyone with the exception of Head exited the van and approached the front door of the house. Hall carried a retractable baton with him. LaForce later testified that he had given Hall the baton earlier that night.
 {¶ 6} When Giddings arrived at the door, Hall began questioning her about Beres's whereabouts. Giddings stated she did not know where Beres could be found. Hall told Giddings to tell Beres, "tell him that Kaseda need to talk to him, and I think you know why." As the group was getting ready to leave, Hogya pulled up in his truck. Hall approached him and struck him in the chest with the baton. Hogya became frightened and ran away. Fisher, who had been absent during Hall's conversation with Giddings, ran from the house saying "he's in the basement." Again, everyone with the exception of Head went back into Giddings's house.
 {¶ 7} In a few minutes, the group exited accompanied by Beres. Beres was protesting his innocence, saying, "[i]t wasn't me, it was Tom [Hogya] that ripped him off. I'll even go tell him that it wasn't me. I'll tell him I didn't rip him off. I wouldn't do that." Hall then pushed Beres against the van and said, "[w]ell, let's go."
 {¶ 8} The entire group, including Beres, then got in the van. Hall instructed Head to drive to Prospect Street. When they located Kaseda on Prospect Street, Hall told Kaseda that he had Beres and invited Kaseda into the van. Hall instructed Head to then "just drive around." Thus, Head drove the van around aimlessly. She claimed she was unable to hear specific conversation because the radio was loud and she was still high on crack she consumed earlier. However, she heard Beres continue to claim he was innocent but that he would try to get the money to Kaseda. Head testified that "things started to get loud" and she turned around at one point and noticed Beres bleeding from his nose. Head then stated that she did not want any blood in her van.
 {¶ 9} Head continued to drive until Hall told her to stop the van. She stopped the van on a dirt road known as Casement Avenue. Head remained in the driver's seat while everyone else exited the van. Head heard yelling and scuffling and, moments later, everyone except Beres got back into the van. Head asked where Beres was, to which Hall replied that he "knocked him out." Head heard a snoring-type sound and asked what it was. Hall reassured her that it was Beres snoring because he was knocked out and told her to drive away. Head then drove the group back to Lyons's house, while Beres lay bleeding on the ground. After stopping at Lyons's house, Head and Hall then proceeded to Head's house where they told LaForce what happened. LaForce told them they should go back and check on Beres.
 {¶ 10} Hall and Head returned to where Beres had been lying. They discovered him lying in a different position and dead. Hall contacted Fisher and told him they had to meet. Upon meeting with Fisher, along with Kaseda and Johnson who also came along, Hall informed them that Beres was dead and that they had to dispose of the body. The group returned to Head's house to discuss what to do with the body. When LaForce heard what had happened, he ordered everyone, except Head, out of the house. However, Head left with the group and went to the home of Ali Brown, Kaseda's girlfriend.
 {¶ 11} On the way to Brown's house, Kaseda telephoned Brown and asked if they could use her car. Once they arrived at Brown's house, everyone exited the van, except for Head. Johnson changed his shirt that had blood on it. Kaseda and Hall removed their shoes, which were also bloody. Brown gave Kaseda a blanket, which he put in the trunk of Brown's car. Head then left Brown's house in her van and returned home. The rest of the group went to get Beres's body, which they then transported in the trunk of Brown's car to University Circle.
 {¶ 12} Head was subsequently contacted by the police as a result of information disclosed to the Painesville Police Department from another suspect in an unrelated arrest. She made several statements, including a written statement. On August 9, 2001, Head was indicted on three counts of felony murder; one count of kidnapping, a felony of the first degree; one count of robbery, a felony of the second degree; and one count of felonious assault, a felony of the second degree.
 {¶ 13} The state dismissed one murder count and the robbery count before the case proceeded to a jury trial on November 7, 2001. On November 9, 2001, the jury returned a guilty verdict on the remaining two murder counts, as well as the kidnapping and felonious assault counts. The jury was discharged, and Head was sentenced to the mandatory sentence of fifteen years to life on the murder-kidnapping conviction. The second count of murder-felonious assault merged into the first murder count for sentencing. Head was also sentenced to five years on the kidnapping count, which was ordered to be served consecutively to the fifteen years to life sentence. Lastly, the felonious assault charge was merged into the murder-kidnapping charge for sentencing purposes. Hence, Head was sentenced to a total of twenty years to life imprisonment.
 {¶ 14} Head subsequently filed this timely appeal, presenting four assignments of error.
THE FIRST ASSIGNMENT OF ERROR IS:
 {¶ 15} "THE TRIAL COURT'S JURY INSTRUCTIONS ERRONEOUSLY DEFINED THE TERM `CAUSE' AND THE ELEMENTS OF COMPLICITY."
 {¶ 16} In the first issue under her first assignment of error, Head contends that the trial court committed plain error when it instructed the jury that aiding and abetting requires only a showing that the defendant acted knowingly where the requisite mental state for a kidnapping conviction is purposefully.
 {¶ 17} "Jury instructions should be plain, unambiguous statements of the law applicable to the case and evidence presented to the jury."[1]
The failure to object to a jury instruction at trial constitutes a waiver of any claims relating to those instructions unless, but for the alleged error, the outcome of the trial clearly would have been otherwise.[2]
Moreover, "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."[3]
 {¶ 18} A defendant is entitled to have the jury instructed on each of the elements that must be proved to establish the crime for which she is charged.[4] Furthermore, where a specific intent or culpability is an essential element of the crime charged, a trial court's failure to instruct the jury on that culpability element constitutes error.[5]
 {¶ 19} In order to establish complicity to a crime, R.C. 2923.03
requires that the state establish that the accused acted with the culpability required for the commission of the underlying offense.[6]
Thus, in its jury instructions the trial court must insert the requisite culpable mental state that is required for the principal offense.[7] In the instant case, the trial court initially instructed the jury on the underlying offenses, which included kidnapping and felonious assault.
 {¶ 20} R.C. 2905.01 defines the offense of kidnapping. It reads, in pertinent part:
 {¶ 21} "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 22} "* * *
 {¶ 23} "(3) To terrorize, or to inflict serious physical harm on the victim or another[.]"
 {¶ 24} R.C. 2903.11 defines the offense of felonious assault. It reads, in pertinent part:
 {¶ 25} "(A) No person shall knowingly do either of the following:
 {¶ 26} "(1) Cause serious physical harm to another[.]"
 {¶ 27} Within its instructions on both of those offenses, the trial court properly defined the required culpable mental state, to-wit: that kidnapping required that the defendant act purposely and that felonious assault required proof that the defendant acted knowingly. The culpable mental states of both purposely and knowingly are statutorily defined as follows:
 {¶ 28} "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."[8]
 {¶ 29} "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."[9]
 {¶ 30} The trial court progressed to the jury instructions regarding the aiding and abetting/complicity statute. In one-and-a-half pages of transcript, the trial court thoroughly stated the law regarding complicity. The court then concluded its jury instruction by reminding the jury that all terms previously defined retained their original definition. Thus, although the court did not specifically address the terms "knowingly" and "purposely" in the complicity portion of the jury instructions, it had previously defined both of those terms as they related to the requisite culpable mental state for both kidnapping and felonious assault and wholly incorporated those definitions.
 {¶ 31} This court has previously held that a trial court's complicity jury instruction properly stated the law where the court separately instructed the jury as to the culpable mental states of the underlying crimes.[10] In State v. Dykes, the defendant was convicted of aggravated robbery and grand theft. This court held that, although the complicity instruction did not refer specifically to the requisite, culpable mental state, the instructions for both underlying offenses included the requisite, culpable mental state instructions. Thus, the defendant was not prejudiced and the jury instructions accurately stated the law.[11]
 {¶ 32} The jury instructions as provided contained a thorough and complete statement of the law regarding kidnapping, felonious assault, and complicity. We find the trial court's failure to redefine knowingly and purposely while instructing the jury regarding complicity does not constitute plain error.
 {¶ 33} In the second issue presented under the first assignment of error, Head contends that the trial court erred when it included "failure to act" language in its definition of "cause," as a complicity conviction requires an overt act.
 {¶ 34} In order to prevail on a claim of erroneous jury instruction, appellant must demonstrate that her right to a fair trial was prejudicially affected by the erroneous instruction.[12] The reviewing court must consider the jury charge in its entirety before making that determination.[13]
 {¶ 35} Regarding the instruction on "cause," the trial court elected to give the standard instruction on "cause," as set forth in Ohio Jury Instructions. The trial court stated:
 {¶ 36} "The State charges that the act of the Defendant caused the death of James J. Beres. Cause is an essential element of the offense. Cause is an act which in a natural and continuous sequence directly produces death, and without which it would not have occurred. The Defendant's responsibility is not limited to the immediate or most obvious result of the Defendant's act. The Defendant is also responsible for the natural and foreseeable consequences or results that follow, in the ordinary course of events, from the act."
 {¶ 37} Later in the charge to the jury, the trial court made the following correction:
 {¶ 38} "And I do notice a typo that I need to correct at this point. And you have your pens, if you go to Page 4, on the definition of cause, where it says, `The State charges that the act of the Defendant caused the death of James J. Beres. Cause is an essential element of the offense. Cause is an act,' and I'm missing three words there, `or failure to act.' So that it should read: Cause is an act or failure to act which in a natural and continuous sequence, et cetera."
 {¶ 39} Head contends that the addition of the words "or failure to act" to the jury instruction constitutes reversible error. Head argues that a conviction under the complicity statute requires an overt act and the failure to act, absent a duty, does not constitute complicity. There is some authority to support that contention.[14] However, in State v.Sipos, the Ninth District held that where the court provided a cause instruction which included both "act" and "failure to act," the resulting error was "harmless beyond a reasonable doubt" when considering the entire charge given the jury by the trial court.[15] We find the reasoning of the Ninth District to be persuasive. Where the jury is given a thorough instruction regarding the underlying offenses as well as the complicity requirements and the cause instruction included "act," the incorporation of "failure to act" when there is no duty to act rises only to harmless error where there is evidence before the jury that the defendant committed an overt act.
 {¶ 40} Thus, the trial court did not commit reversible error in its charge to the jury. The first assignment of error is without merit.
 {¶ 41} THE SECOND ASSIGNMENT OF ERROR IS:
 {¶ 42} "THE CONVICTION OF MS. HEAD FOR COMPLICITY TO COMMIT KIDNAPPING AND FELONIOUS ASSAULT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 43} In the first issue under the second assignment of error, Head contends that her conviction for complicity to commit kidnapping was against the manifest weight of the evidence where the evidence presented at trial established that Beres entered Head's van voluntarily and no evidence was presented that Head aided or abetted in kidnapping.
 {¶ 44} In determining whether a conviction is against the manifest weight of the evidence, "`[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"[16]
 {¶ 45} R.C. 2905.01 sets forth the elements of kidnapping:
 {¶ 46} "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 47} "* * *
 {¶ 48} "(2) To facilitate the commission of any felony or flight thereafter;
 {¶ 49} "(3) To terrorize, or to inflict serious physical harm on the victim or another[.]"
 {¶ 50} Head contends that, per her own uncontradicted testimony at trial, it was established that Beres entered her van willingly without threat or physical force and, as such, no kidnapping occurred. The state's only witness that was present when Beres entered the van, Fisher, testified that he was speaking to Giddings at the time and did not see Beres enter the van.
 {¶ 51} We are not persuaded by Head's argument. Although the trial testimony establishes that Beres may have entered the van without physical force, it was clear that Beres had been "hiding out" at Giddings's home and, only after subsequently being discovered, did he agree to get in the van to be confronted by Kaseda. Moreover, the testimony presented at trial demonstrated that Head was aware that Beres had been physically assaulted by the group while riding in the van. Once the assault began, Beres was undoubtedly no longer interested in remaining in the van, and, yet, Head did not attempt to drive to a police station or seek assistance for Beres at any time and continued to drive until ordered to stop by Hall. At that point, there was a restraint on Beres's liberty of which Head was aware and she continued to act. Thus, reviewing the evidence presented at trial, Head's conviction of complicity to kidnapping was not against the manifest weight of the evidence.
 {¶ 52} In the second issue under the second assignment, Head contends that the felonious assault conviction was also against the manifest weight of the evidence.
 {¶ 53} R.C. 2903.11 sets forth the elements of felonious assault and reads, in pertinent part:
 {¶ 54} "(A) No person shall knowingly do either of the following:
 {¶ 55} "(1) Cause serious physical harm to another or to another's unborn[.]"
 {¶ 56} Head contends that the state failed to prove beyond a reasonable doubt that she acted with knowledge that her actions would aid or abet in the felonious assault of Beres. We disagree.
 {¶ 57} Upon initially arriving at Lyons's residence, Head and Hall learned that Kaseda had been "ripped off" by Beres. At that point, as Hall began cultivating a plan of action to find Beres, Head was aware that Beres was being targeted. Fisher testified at trial that Hall told Fisher if Hall did not get the money Fisher owed him, he would get his "ass whooped." Thus, it was clear that Hall intended on collecting the debts owed.
 {¶ 58} Moreover, Fisher testified that Hall was carrying around a retractable baton, which he got earlier that evening from LaForce. Head testified that she recognized the baton as belonging to LaForce but she was not aware how Hall obtained it. Hall used the baton while threatening Giddings in an attempt to find Beres and, in fact, struck Hogya with the baton before finding Beres. Head testified that she saw Hall strike Hogya, further reinforcing the state's argument that she was aware of the situation and continued to further it by driving the group from point to point without hesitation.
 {¶ 59} Lastly, both Fisher and Head testified that Beres was bleeding in the van and had not been prior to entering. In fact, Head testified that she did not want any blood in her van, thus acknowledging that the five adult males in the back of her van were engaging in some type of bloody skirmish. Head also testified that once she stopped the van and the group exited, she purposely remained in the van because she "did not want to look" at what was happening.
 {¶ 60} Therefore, we find Head's contention that her conviction for complicity to commit felonious assault is against the manifest weight of the evidence to be wholly without merit. The second assignment of error is without merit.
 {¶ 61} THE THIRD ASSIGNMENT OF ERROR IS:
 {¶ 62} "MS. HEAD'S RIGHTS UNDER ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION WERE VIOLATED BY THE INEFFECTIVE ASSISTANCE OF HER TRIAL COUNSEL."
 {¶ 63} It is presumed that a properly licensed attorney in the state of Ohio has rendered effective assistance to a criminal defendant.[17]
In order to demonstrate ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in Strickland v.Washington.[18] First, pursuant to Strickland, the defendant must show that counsel's performance was deficient in that the representation fell below the objective standard of reasonableness.[19] Second, the defendant must show that counsel's deficient performance prejudiced the defendant, meaning that, but for counsel's errors, the outcome of the proceeding would have been different.[20] This court has adopted the Strickland
standard for ineffective assistance of counsel.[21]
 {¶ 64} In her third assignment of error, Head avers that her trial counsel was ineffective as he presented no "perceivable trial strategy" and where the record indicates that he was "wholly unprepared for trial."
 {¶ 65} While poor or unsuccessful trial strategies typically will never amount to ineffective assistance of counsel, the lack of any trial strategy may support such a claim.[22] Head contends that her trial counsel was ineffective for several reasons. First, she notes that counsel's opening statement showed that counsel "made no effort to describe the expected evidence and testimony in Ms. Head's favor." Specifically, Head notes that trial counsel noted that Head was "probably guilty of bad judgment" and "she should have called the police."
 {¶ 66} We are not persuaded by these comments during counsel's opening statement. Counsel did attempt to persuade the jury that Head was not part of a group but, rather, a victim of poor judgment. Although this strategy was not successful, it does not rise to the level of ineffective assistance of counsel.[23]
 {¶ 67} Head also takes issue with trial counsel's examination of the state's witnesses. She asserts that trial counsel asked the state's witnesses poorly constructed questions that lacked any relevance. She also asserts that the questions undermined the proposed trial strategy. However, the questions elicited from the state's witnesses only corroborated statements made by other witnesses, and did not contradict her testimony.
 {¶ 68} Head also refers to the testimony of the coroner. Head contends that defense counsel was ineffective in failing to object to inflammatory testimony and photographs regarding the decomposition of Beres's body, including severe maggot infestation of the head. The admission of photographs is left to the trial court's discretion.[24] Moreover, gruesome photographs and trial testimony are admissible if their probative value outweighs the danger of prejudice to the defendant.[25]
 {¶ 69} In the instant case, the coroner testified as to the timing and nature of the physical injuries sustained by Beres. Part of that description involved a description of the injuries to the face and chest, including a description of Beres's body when it arrived at the coroner's office. Thus, the testimony was pertinent to the coroner's discussion of Beres's injuries and their relation to the cause of death. Therefore, the probative value outweighed the prejudicial nature of the testimony.
 {¶ 70} Appellant also takes issue with how defense counsel conducted its case-in-chief. Specifically, defense counsel called only two witnesses: Head and Hall. Hall subsequently exercised his Fifth Amendment rights. Head argues that defense counsel erred in failing to call any character witnesses on her behalf, particularly in light of the fact that, prior to Spring 2001 when she met Hall, Head was a caretaker for her three children, one of which was terminally ill, and employed as a home healthcare worker.
 {¶ 71} Generally, an ineffective assistance of counsel claim cannot be established by a failure by defense counsel to call character witnesses.[26] There is no evidence in the record that such evidence was available or that LaForce was willing to testify on her behalf. Thus, absent any such evidence, we cannot say that trial counsel was deficient in failing to call character witnesses on Head's behalf.
 {¶ 72} Head also contends that defense counsel was deficient in failing to present any expert testimony to refute the findings of the coroner, Dr. Challener. Head cites this court's holding in State v.Wotring, for the proposition that trial counsel was ineffective for failing to get an independent expert.[27] However, this court subsequently determined that counsel was not ineffective upon reconsideration.[28] Moreover, there was substantial evidence that Beres was assaulted while in the van as well as during the beating that occurred outside the van. Thus, the severity of his injuries had already been established.
 {¶ 73} Head also contends that counsel was ineffective in conducting a redirect examination of her. Specifically, Head avers that counsel's failure to try to rehabilitate her testimony after prior inconsistent statements were demonstrated on cross-examination, should have been addressed on redirect. A review of the trial transcript reveals that the defense strategy was that Head was afraid of Fisher and, thus, had provided inconsistent statements as a result. The fact that counsel did not reiterate that through redirect does not constitute ineffective assistance.
 {¶ 74} In the fourth issue under the third assignment, Head contends that defense counsel was ineffective during closing argument and failed to fully point out all of the "deficiencies in the State's case." This court has noted that counsel is given latitude in conducting closing arguments.[29] The substance of the defense's closing argument reveals an attempt to assert the lack of any restraint on Beres's liberty, as he willfully entered the van, as well as to establish Head's real lack of knowledge and involvement in the event. Although this theory was ultimately unsuccessful, it still operates as a valid trial strategy and, as such, does not rise to an ineffective counsel claim.[30]
 {¶ 75} Finally, in the fifth issue under the third assignment, Head contends that defense counsel was deficient during sentencing for failing to request a separate sentencing hearing and for failing to present any mitigating evidence on her behalf.
 {¶ 76} During the sentencing phase, defense counsel did present mitigating evidence on Head's behalf. Specifically, counsel requested leniency because Head was the mother of three young children and had no previous criminal record. Head has not established that defense counsel's strategy during sentencing prejudiced her. Moreover, appellant has not established how counsel's decision not to call additional mitigation witnesses constituted performance below a reasonable standard and she is unable to demonstrate with a reasonable probability that the result at sentencing would have been different had any of these people been called.
 {¶ 77} The third assignment of error is without merit.
 {¶ 78} THE FOURTH ASSIGNMENT OF ERROR IS:
 {¶ 79} "THE TRIAL COURT ERRED BY SENTENCING MS. HEAD TO CONSECUTIVE, RATHER THAN CONCURRENT SENTENCES."
 {¶ 80} In the fourth assignment of error, Head contends that the trial court erred in imposing consecutive sentences when it failed to make the statutory findings and set forth its reasons in support.
 {¶ 81} Pursuant to R.C. 2953.08, an appellate review of a felony sentence is de novo.[31] This court will not disturb a felony sentence unless we find, by clear and convincing evidence, that the record does not support the sentence or that the sentence is otherwise contrary to law.[32]
 {¶ 82} A court may not impose consecutive sentences for multiple offenses unless it "finds" three statutory factors. First, the court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. Second, the court must find that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public. Third, the court must find the existence of one of the enumerated circumstances in R.C. 2929.14(E)(4)(a) through (c).
 {¶ 83} Moreover, the trial court must comply with R.C. 2929.19(B)(2)(c), which requires that the court make a finding that gives its reasons for imposing a consecutive sentence.
 {¶ 84} In State v. Comer, the Supreme Court of Ohio held that a trial court cannot make the statutory findings through only a written judgment entry but, rather, is required to state on the record at the hearing its reasons in support of a consecutive sentence.[33]
 {¶ 85} In the instant case, the trial court stated at the hearing:
 {¶ 86} "The Court also finds that consecutive sentences are required in order to protect the public and punish the Defendant and are not disproportionate to the seriousness of the Defendant's conduct and the danger the Defendant poses to the public; and that the Defendant caused such great harm that no single prison term for any of the offenses committed as part of a single course of conduct reflects the seriousness of the conduct."
 {¶ 87} The trial court also stated at sentencing:
 {¶ 88} "I find that the Defendant actively participated, despite her claims, in that she positioned the vehicle to shield what was going on, as they mercilessly beat Mr. Beres to death, so that the headlights of cars going around the curve there on Erie Street Extension wouldn't see their deeds.
 {¶ 89} "I find that the intent to terrorize is separate and apart from the intent to inflict serious physical harm. And I find that all of this was done to promote drug trafficking in Painesville, so that this drug cartel could operate with impunity so that anybody that decided to rip this drug cartel off would have the memory of James — James Beres and so that drugs will continue to flourish in Painesville. This group of individuals is one the main causes for the quality of life in a [sic] the north end of Painesville."
 {¶ 90} As the foregoing statements demonstrate, the trial court specifically stated appellant's role in Beres's demise, including being the driver of the van throughout the course of events that led up to the beating. We conclude that the trial court adequately set forth its reasons in support of consecutive sentences at the hearing, pursuant to R.C. 2929.19(B)(2)(c) and Comer.
 {¶ 91} That said, the dissent argues Head's sentence is unconstitutional in violation of the United States Supreme Court's holdings in Blakely v. Washington[34] and United States v. Booker.[35]
Appellant did not challenge the constitutionality of her sentence and therefore the dissent raises this issue sua sponte.
 {¶ 92} Generally, we will refrain from addressing any issue not passed upon by the trial court.[36] This principle applies equally to procedural issues and constitutional rights.[37] While we may make determinations as to issues not raised by parties, we abuse our discretion by deciding constitutional issues not raised or briefed by the parties.[38] If an appellate court wished to decide a constitutional issue not argued, the best practice is to grant the parties leave to brief that issue first.[39]
 {¶ 93} This court has freely granted parties leave to brief Blakely
challenges in pending appeals. Here, appellant did not seek leave to raise Blakely nor did we provide the parties an opportunity to brief it. Therefore, we would abuse our discretion were we to decide this appeal on our own sua sponte application of Blakely.
 {¶ 94} However, it does bear noting that Apprendi v. New Jersey,[40]
along with Blakely and Booker have generated numerous opinions pertaining to the constitutionality of Ohio's felony sentencing statutes. In light of the vast corpus of legal analysis pertaining to this line of cases, we are aware of no appellate district that has held that a trial court's imposition of consecutive sentence implicates Blakely or otherwise violates a defendant's Sixth Amendment rights to a jury trial. See, e.g.State v. Lowery, 1st Dist. No. C-040280, 2005-Ohio-1760, ¶ 54; State v.Sour, 2d Dist. No. 19913, 2004-Ohio-4048, ¶ 7; State v. Scarberry, 3d Dist. No. 8-04-32, 2005-Ohio-1425, ¶ 10; State v. Wheeler, 4th Dist. No. 04CA1, 2004-Ohio-6598, ¶ 23; State v. Small, 5th Dist. No. 04CAA04032, 2005-Ohio-169, ¶ 42; State v. Holt, 6th Dist. No. E-04-004, 2005-Ohio-1554, ¶¶ 38-39; State v. Barnette, 7th Dist. No. 02 CA 65, 2004-Ohio 7211, ¶ 107; State v. Lett, 8th Dist. Nos. 84707 84729,2005-Ohio-2665, ¶ 46; State v. Searns, 9th Dist. No. 04CA008515, 2005-Ohio-870, ¶ 7; State v. Abdul-Mumim, 10th Dist. Nos. 04AP-485 
04AP-486, 2005-Ohio-522, ¶ 30; State v. Langlois, 11th Dist. No. 2003-A-0080, 2005-Ohio-2795, ¶ 44; State v. Collier, 12th Dist. No. CA2003-11-282, 2005-Ohio-944, ¶ 41.
 {¶ 95} Federal courts have also consistently arrived at the same conclusion. See, e.g., United States v. Feola (C.A. 2, 2001), 275 F.3d 216,220; United States v. McWaine (C.A. 5, 2002), 290 F.3d 269, 275-276;United States v. Pressley (C.A. 11, 2003), 345 F.3d 1205, 1213; UnitedStates v. Wingo (C.A. 6, 2003), 76 Fed. Appx. 30; United States v.Sauceda (C.A. 6, 2002), 46 Fed. Appx. 322.
 {¶ 96} It is clear that the position adopted by the dissent finds support in neither Ohio nor Federal caselaw. We therefore hold that Head's sentences were lawfully imposed and, consequently, her fourth assignment of error is without merit.
 {¶ 97} Based on the foregoing, the judgment of the Lake County Court of Common Pleas is affirmed.
Grendell, J., concurs,
O'Neilla J., dissents with Dissenting Opinion.
[1] State v. Mays, 11th Dist. No. 2001-T-0071, 2003-Ohio-63, at ¶ 41, citing Marshall v. Gibson (1985), 19 Ohio St.3d 10, 12.
[2] State v. Twyford (2002), 94 Ohio St.3d 340, 349-350, quoting Statev. Underwood (1983), 3 Ohio St.3d 12, syllabus.
[3] State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.
[4] State v. Adams (1980), 62 Ohio St.2d 151, 153.
[5] Id.
[6] See R.C. 2923.03(A).
[7] 4 Ohio Jury Instructions (2003), Section 523.03, at 629.
[8] R.C. 2901.22(A).
[9] R.C. 2901.22(B).
[10] State v. Dykes (Dec. 17, 1993), 11th Dist. No. 92-L-078, 1993 Ohio App. LEXIS 6082, at *21-22.
[11] Id.
[12] State v. Porter (1968), 14 Ohio St.2d 10, paragraph two of the syllabus.
[13] Id.
[14] State v. Kline (1983), 11 Ohio App.3d 208, 214.
[15] State v. Sipos (Aug. 5, 1987), 9th Dist. Nos. 2238 and 2239, 1987 Ohio App. LEXIS 8213, at *9.
[16] (Citation omitted.) State v. Thompkins (1997), 78 Ohio St.3d 380,387.
[17] State v. Hurd, 11th Dist. No. 2001-T-0086, 2002-Ohio-7163, at ¶ 32.
[18] Strickland v. Washington (1984), 466 U.S. 668.
[19] Id. at 687.
[20] Id.
[21] State v. Beesler, 11th Dist. No. 2002-A-0001, 2003-Ohio-2815, at ¶ 10.
[22] See, State v. Clayton (1980), 62 Ohio St.2d 45, 49.
[23] See, State v. Smith (1985), 17 Ohio St.3d 98, 101.
[24] State v. Landrum (1990), 53 Ohio St.3d 107, 121.
[25] Id.
[26] State v. Hibbler, 2d Dist. No. 2001-CA-43, 2002-Ohio-4464, at ¶ 30.
[27] State v. Wotring, 11th Dist. No. 99-L-114, 2001-Ohio-8836.
[28] State v. Wotring, 11th Dist. No. 99-L-114, 2003-Ohio-326.
[29] See, State v. Elswick, 11th Dist. No. 2001-A-0035, 2002-Ohio-3365, at ¶ 34.
[30] Id.
[31] State v. Gibson, 11th Dist. No. 2002-T-0055, 2003-Ohio-5695, at ¶ 68.
[32] (Citation omitted.) State v. Thomas (July 16, 1999), 11th Dist. No. 98-L-074, 1999 Ohio App. LEXIS 3334, at *10.
[33] State v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, paragraph one of the syllabus.
[34] Blakely v. Washington (2004), 124 S.Ct. 2531.
[35] United States v. Booker (2005), 125 S.Ct. 738.
[36] State v. 1981 Dodge Ram Van (1988), 36 Ohio St.3d 168, 170.
[37] Id.
[38] Id., 169-170, 171.
[39] Id. at 170.
[40] Apprendi v. New Jersey (2000), 530 U.S. 466.