OPINION
{¶ 1} Defendant-appellant, Geno M. Battaia, appeals his judgment of conviction, following jury trial, on two counts of Assault. We affirm the judgment of the court below.
 {¶ 2} On October 6, 2006, the Lake County Grand Jury returned an indictment against Battaia, charging him with two counts of Assault, felonies of the fourth degree, in violation of R.C. 2903.13(A) and2903.13(C)(3). Both counts were based upon allegations that on or about May 4, 2006, Battaia injured Sergeant Philip Smith and Patrolman Jason Bryant of the Willoughby Police Department while engaged in an *Page 2 
altercation with several police officers as they attempted to book him for Disorderly Conduct at the police station.
 {¶ 3} Battaia waived reading of the indictment, and entered a plea of not guilty to the charges.
 {¶ 4} The matter proceeded to a one-day trial on January 25, 2007. The jury returned a verdict of guilty on both charges.
 {¶ 5} On March 14, 2007, the trial court ordered Battaia to serve concurrent twelve-month prison terms on each count, for a total sentence of twelve months, with a term of post-release control of up to three years.
 {¶ 6} Battaia timely appealed, assigning the following as error:
 {¶ 7} "The trial court erred to the prejudice of defendant-appellant, when it returned a verdict of guilty against the manifest weight of the evidence."
 {¶ 8} Manifest weight of the evidence raises a factual issue and involves "the inclination of the greater amount of credible evidence."State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52 (emphasis sic) (citation omitted). Although the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to determine, State v. Thomas (1982), 70 Ohio St.2d 79, at syllabus, when reviewing a manifest weight challenge, the appellate court sits as the "thirteenth juror." Thompkins, 78 Ohio St.3d at 387 (citation omitted). As such, the reviewing court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed * * *." Id., quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. *Page 3 
 {¶ 9} Battaia does not dispute that the evidence was sufficient, when viewed in a light most favorable to the prosecution, to have been submitted to a jury. Based upon the factors enunciated in State v.Mattison (1985), 23 Ohio App.3d 10, Battaia argues that the jury's verdict of guilty was against the manifest weight of the evidence, based upon the "incredible," contradictory, and "self-serving" testimony of the State's witnesses.
 {¶ 10} We note, at the outset, "[t]his court has repeatedly held, that while `the Mattison factors are helpful guidelines when exploring whether a verdict is against the weight of the evidence * * * they do not create a specific standard [of review] to be applied to manifest weight claims.'" State v. Higgins, 11th Dist. No. 2005-L-215, 2006-Ohio-5372, at ¶ 38, quoting State v. Torres-Flores, 11th Dist. No. 2005-L-046,2006-Ohio-3212, at ¶ 29. Instead, we have "repeatedly deferred to the standards of review set forth by the Supreme Court of Ohio." Id., quoting State v. Peck, 11th Dist. No. 2004-L-021, 2005-Ohio-1413, at ¶ 13.
 {¶ 11} Applying the Supreme Court standard, we must, exercise our discretionary power to reverse a judgment as being against the manifest weight of the evidence only in "those extraordinary cases where, on the evidence and theories presented, and taken in a light most favorable to the prosecution, no reasonable [trier of fact] could have found thedefendant guilty." State v. Bradford (Nov. 7, 1988), 5th Dist. No. CA-7522, 1988 Ohio App. LEXIS 4576, at *4, citing Martin,20 Ohio App.3d at 175 (emphasis added).
 {¶ 12} Applying the aforementioned standard to this case, and reviewing the evidence in a light most favorable to the prosecution, we must determine if no *Page 4 
reasonable jury could have found Battaia guilty of "knowingly caus[ing] or attempting] to cause physical harm" to Sergeant Smith and Patrolman Bryant, while they were "in the performance of their official duties." R.C. 2903.13(A) and (C)(3).
 {¶ 13} "The culpable mental state of `knowingly' is statutorily defined as follows: `A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature .'" State v. Hill, 11th Dist. No. 2005-A-0010, 2006-Ohio-1166, at ¶ 24, citing R.C. 2901.22(B);State v. Head, 11th Dist. No. 2001-L-228, 2005-Ohio-3407, at ¶ 29.
 {¶ 14} The testimony elicited at trial established the following facts:
 {¶ 15} On May 4, 2006, at approximately 12:10 a.m., the Willoughby Police Department received a call from a "Todd" at Panini's Bar and Grille, located on Euclid Avenue in Willoughby, Ohio. The caller reported that a male patron, later identified as Battaia, was drunk, causing a disturbance, and refusing to leave the restaurant, despite requests to do so.
 {¶ 16} Officer Michael Fitzgerald and Jason Bryant were first to arrive on the scene, where they were met by three other officers, including Sergeant Philip Smith. Fitzgerald, Bryant and Smith all testified that they observed approximately 15 people, along with an obviously intoxicated Battaia in the parking lot. Battaia was yelling and swearing. Officer Fitzgerald stated that he and Officer Bryant approached Battaia to try to talk to him, and he told them that he could not leave the area because his friends were still inside, and he needed to wait for them for a ride home, because he was "shitfaced," and should not be driving. Officers Fitzgerald and Bryant, alternatively described Battaia's behavior as "loud" and "belligerent," and that his shouting and *Page 5 
swearing continued to escalate despite several requests from officers for him to be quiet.
 {¶ 17} After several minutes of trying to calm Battaia down to no avail, and failing in their attempt to locate his friends, the officers determined that the most reasonable course of action, under the circumstances, was to take Battaia into custody for Disorderly Conduct. Officers Fitzgerald and Bryant effectuated the arrest, at which time Battaia was patted down for weapons, handcuffed, and placed into their cruiser for transport to the police station.
 {¶ 18} Sergeant Smith characterized Battaia's behavior during the arrest as "still belligerent, [and he was] not real happy with the fact that he was being arrested." Smith testified that from his observations during the arrest, he could see "that [Battaia] might be a problem," so he drove back to the station to assist with booking, arriving before Officers Fitzgerald and Bryant.
 {¶ 19} Battaia, who testified in his own defense, stated that he had arrived at Panini's approximately four to five hours before he was kicked out of the bar, that he had been drinking that evening, and admitted to being "a big pain in the butt," prior to police taking him into custody on the Disorderly Conduct charge. He further testified that he was aware that the police had cause to arrest him for being disorderly, based upon his behavior, and that he "was fine with it." However, contrary to Battaia's testimony, Officer Fitzgerald testified that on the ride back to the station, Battaia remained belligerent, "threatening to sue us," and calling the officers "fuckheads."
 {¶ 20} Upon their arrival back at the police station, Officers Fitzgerald and Bryant checked their weapons, and Battaia was escorted, in handcuffs, to the booking room, at *Page 6 
which time he was frisked a second time and his handcuffs were removed. Sergeant Smith and Lieutenant Sevel, who had also responded to the call, remained outside the booking room while this process occurred, since, according to Sergeant Smith, Battaia remained agitated and belligerent. According to testimony from Officer Fitzgerald and Sergeant Smith, Battaia wished to make a phone call, but the officers told him that he would have to wait until the booking process was completed before being allowed to make a call.
 {¶ 21} Battaia stood in front of the booking desk while Officer Bryant, who was a trainee at the time, and Officer Fitzgerald, who was supervising, stood behind the desk. Per departmental and state procedures, Officer Bryant requested that Battaia remove his personal effects from his pockets, as well as his belt and shoelaces, and then he was ordered to sit down, so that Officer Bryant could begin to enter his booking information into the computer.
 {¶ 22} One of the items recovered from Battaia was his cell phone. Officer Bryant testified that he opened the phone, discovered it was turned on, and handed it back to Battaia, so that he could turn it off. Battaia flipped the phone open and began pressing buttons. Officer Bryant repeatedly requested that Battaia return the phone, but Battaia refused. When Officer Bryant reached out to take the phone, Battaia pulled his hand back, in what Smith, Bryant and Fitzgerald characterized as a "threatening" gesture, as if he were attempting to strike Officer Bryant.
 {¶ 23} Officers Bryant and Fitzgerald pulled Battaia over the desk in a face down position, and a struggle ensued. Sergeant Smith testified that he and Lieutenant Sevel attempted to gain control of Battaia from behind and place handcuffs on him, but were *Page 7 
unable to do so, because Battaia had grabbed onto the desk and would not let go. Smith testified that Battaia attempted to kick him in the legs. Battaia testified that if his legs moved at all during this time, it was only because he was having difficulty breathing and was attempting to change his position.
 {¶ 24} Police eventually exerted enough control over Battaia to attempt to carry him down the hallway to the holding cell, with each officer holding one of Battaia's limbs. Fitzgerald, Smith, and Bryant testified that Battaia continued to struggle, and punch and kick at them as they carried him toward the cell. Officer Smith testified that, at one point during the altercation, Battaia freed his leg and kicked him in the face. A photograph of Smith's face, taken shortly after the incident and admitted into evidence, showed a large welt and scratches on Smith's face.
 {¶ 25} The officers testified that they were eventually able to control Battaia enough to carry him to the holding cell, but upon reaching the doorway, Battaia grabbed onto the bars, and began kicking at the officers, at which time, he kicked Officer Bryant in the groin, which temporarily disabled Bryant.
 {¶ 26} Marlene Matteo and Peter Gammiere, two dispatchers who were on duty the night of this incident, also testified. Matteo and Gammiere testified that while they were in the process of fielding emergency calls, they heard "a lot of commotion" coming from the opposite end of the building where the officers were. Both testified that they were able to see parts of the incident from monitors receiving feeds from a series of stationary video cameras located in various parts of the building.
 {¶ 27} Matteo, who was working fire dispatch on the evening in question, testified that she observed some of the struggle in the booking room and stated that Battaia was *Page 8 
"face first on the table and there was a lot of commotion," before the police eventually gained control of him. The next time Matteo had an opportunity to observe the monitor, "they were escorting [Battaia] out of booking and we couldn't see, pick anything up on the monitor until they attempted to place him in cell one." At that point, Matteo testified that Battaia "was still fighting, he was still not under control, [but] he did walk in the cell of his own will." The last thing Matteo testified seeing "was Sergeant Smith kicking his foot trying to get Mr. Battaia off his foot so they could lock him down in his cell."
 {¶ 28} Gammiere, who was working police dispatch that evening, testified hearing the disturbance coming from the back of the building and "noticed the person that was brought back was bent over the desk in a more or less subdued position," but that Battaia's feet were free and he was "kicking backwards." Gammiere testified that the next thing he remembered was that "they had the person picked up and were moving him out of the booking area towards the cell." Gammiere testified he saw officers moving in front of the cell, but the view from the camera into the cell was blocked. A short time later, after fielding additional emergency calls, the last thing Gammiere remembered observing was Sergeant Smith "getting up and trying to leave the cell" and having to shake free because "the person had a hold of his foot."
 {¶ 29} When assessing the credibility of witnesses, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan (1986),22 Ohio St.3d 120, 123. This is because it is "the trier of fact who is in the best position to observe and evaluate the demeanor, voice inflection, and *Page 9 
gestures of the witnesses." State v. Dach, 11th Dist. No. 2005-T-0048 and 2005-T-0054, 2006-Ohio-3428, at ¶ 42 (citation omitted).
 {¶ 30} Although Matteo's testimony that Battaia "walked in[to] the cell of his own will," is inconsistent with the testimony of the other state's witnesses, this, in and of itself, is not enough to overturn the jury's verdict for Assault, which, as stated earlier, merely requires that Battaia "knowingly cause or attempt to cause physical harm" to Sergeant Smith and Patrolman Bryant, while they were "in the performance of their official duties."
 {¶ 31} As an initial matter, Matteo acknowledged that she was unable to watch the entire incident as it unfolded, due to the limited view from the cameras and the fact that her attention was diverted by having to handle emergency calls.
 {¶ 32} Although her testimony differed from other witnesses with regard to whether Battaia walked into the cell of his own free will, this is not dispositive, particularly when she also testified that when the officers and Battaia appeared in the cell camera's view, "there was still fighting, and Mr. Battaia was still not under control," and all of the other state's witnesses testified uniformly that Battaia was "fighting" and resisting against the officers.
 {¶ 33} Battaia, by his own acknowledgement, was intoxicated, loud, belligerent, and verbally abusive to officers on the night of the incident. Furthermore, he admitted that he did not immediately comply with Officer Bryant's requests to turn over the cell phone.
 {¶ 34} Although Battaia claims he did not, at any time, attempt to punch, kick, or otherwise harm the officers, the testimony from Smith and other witnesses that he was *Page 10 
kicked in the face during the struggle, along with photographic evidence of a large welt and scratches on his face following the incident, is enough to belie this claim.
 {¶ 35} In addition, Officer Bryant testified that he was kicked in the groin by Battaia during the incident, and that this kick temporarily disabled him.
 {¶ 36} It is well-settled that "the factfinder is free to believe all, part, or none of the testimony of each witness appearing before it."Warren v. Simpson (Mar. 17, 2000), 11th Dist. No. 98-T-0183, 2000 Ohio App. LEXIS 1073, at *8. Moreover, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. Id.
 {¶ 37} Based upon the foregoing, we cannot conclude that the jury lost its way or created a manifest miscarriage of justice by returning a verdict of guilty.
 {¶ 38} Battaia's sole assignment of error is without merit.
 {¶ 39} We affirm the judgment of the Lake County Court of Common Pleas.
MARY JANE TRAPP, J., concurs,
COLLEEN MARY OTOOLE, J., dissents with a Dissenting Opinion.