OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Defendant-Appellant, Marcus Harris, appeals the sentencing decision of the Jefferson County Court of Common Pleas after a jury found him guilty of aggravated murder, two counts of kidnapping, two counts of aggravated burglary, four counts of aggravated robbery, two counts of felonious assault, and eleven firearm specifications. Harris raises six issues on appeal. Those issues can be separated into three categories: 1) pretrial issues, 2) trial issues, and 3) sentencing issues.
 {¶ 2} First, Harris contends that the State engaged in purposeful racial discrimination when using a peremptory challenge to strike an African-American member of the venire. However, the State gave a race-neutral reason explaining why it did not want that juror on the jury and Harris failed to show that this race-neutral reason was pretextual.
 {¶ 3} Second, Harris claims the trial court erred in a variety of ways when it allowed certain evidence to be admitted at trial. However, Harris did not object to the introduction of much of this evidence and it does not appear the trial court abused its discretion when admitting the various evidentiary material Harris addresses in his brief.
 {¶ 4} Third, Harris maintains the trial court erred when sentencing him to maximum, consecutive sentences and ordered that his firearm specification prison terms be served consecutively. After Harris filed his brief, the Ohio Supreme Court issued a decision in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-0856, which controls our resolution of the issues Harris raises regarding his maximum and consecutive sentences. Furthermore, the trial court erred by ordering that Harris' firearm specification prison terms be served consecutively since the felonies he was convicted of committing occurred in the same transaction. Accordingly, we modify Harris' sentence to reflect that his firearm specifications will be served concurrently and, pursuant to the Ohio Supreme Court's directive in Foster, vacate the remainder of Harris' sentence and remand this cause for resentencing.
 Facts {¶ 5} Harris was acquainted with Angela and Scott Mellinger and believed that Scott owed him money. Harris heard that the Mellingers may have some money at their home, so he and Harold Hayes planned to break in and rob the Mellingers.
 {¶ 6} On September 11, 2003, the two broke into the Mellingers home. Hayes held Angela's son, Jordan Marincic, on the ground at gunpoint while Harris entered the Mellinger's master bedroom. While in the room, he held both Angela and Scott at gunpoint. Eventually, Scott began wrestling with Harris so Angela could call the police. After she called, she heard two gunshots. Jordan then came into her bedroom as Harris and Hayes fled. Angela then found Scott dead on the floor outside the bedroom.
 {¶ 7} Harris was arrested and the Jefferson County Grand Jury returned an indictment charging Harris with one count of aggravated murder without a death penalty specification, seven counts of aggravated murder with death penalty specifications, two counts of kidnapping, two counts of aggravated burglary, four counts of aggravated robbery, and two counts of felonious assault. Each count in the indictment contained a firearm specification.
 {¶ 8} The case proceeded to a jury trial on November 8, 2004. After voir dire, the State used a peremptory challenge to excuse an African-American from the jury. The trial court overruled a challenge to the constitutionality of this action. At the conclusion of the trial, the jury found Harris not guilty of the aggravated murder count without the death specification, but guilty of all other counts in the indictment, including firearm specifications. Following a hearing, the jury recommended a sentence of life in prison without the possibility of parole.
 {¶ 9} When sentencing Harris, the trial court followed the jury's recommendation and sentenced Harris to life in prison without the possibility of parole. It also imposed the maximum term of imprisonment on Harris for each of the felonies he committed and ordered that some of those terms be served consecutively. Furthermore, the trial court ordered that each of the firearm specifications be served consecutively. Accordingly, Harris was sentenced to sixty-one years in prison in addition to his life sentence.
 Batson Challenge {¶ 10} In his first of six assignments of error, Harris argues:
 {¶ 11} "When the prosecutor exercises a peremptory challenge of a prospective juror in a racially discriminatory manner, in contravention of Batson v. Kentucky (1986), 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69, and its progeny, the trial court's refusal to impanel a new venire or fashion another appropriate remedy deprives the defendant of his right to equal protection of the law, as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Ohio Constitution."
 {¶ 12} In this case, the State used a peremptory challenge over objection to excuse a prospective African-American juror and gave race-neutral reasons for excusing this juror. Harris claims these reasons were merely pretextual and that the trial court erred when it found them legitimate.
 {¶ 13} A prosecutor violates the Equal Protection Clause of the United States Constitution when she uses peremptory challenges to purposefully exclude members of a minority group because of their minority status. Batson v. Kentucky (1986),476 U.S. 79, 85-86; State v. Bryan, 101 Ohio St.3d 272, 2004-Ohio-0971. "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race." Id. at 86. And Batson
does more than simply proscribe the State from excluding the members of the defendant's race; it bars all racially discriminatory jury selection. Powers v. Ohio (1991),499 U.S. 400, 409. "Race cannot be used as a proxy for determining juror bias or competence." Id. at 410. "A person's race simply `is unrelated to his fitness as a juror.'" Batson at 87, quotingThiel v. Southern Pacific Co. (1946), 328 U.S. 217, 227
(Frankfurter, J., dissenting).
 {¶ 14} Courts analyze a Batson claim in three steps: 1) the opponent of the peremptory strike must make a prima facie case of racial discrimination; 2) the party making the peremptory challenge must present a racially neutral explanation for the challenge; and, 3) the trial court must decide whether the opponent has proved a purposeful racial discrimination. Batson
at 96-98. The party opposing the peremptory strike bears the burden of proving purposeful discrimination. Purkett v. Elem
(1995), 514 U.S. 765, 768; Hernandez v. New York (1991),500 U.S. 352, 359. A trial court's findings of no discriminatory intent will not be reversed unless clearly erroneous. Id. at 365;Bryan at ¶ 106.
 {¶ 15} When reviewing this case, this court does not need to worry about whether Harris made a prima facie case of racial discrimination. If a prosecutor "offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez at 359; State v. White,85 Ohio St.3d 433, 437, 1999-Ohio-0281.
 {¶ 16} A race-neutral explanation for a peremptory strike is simply "an explanation based on something other than the race of the juror." Id. at 360. "[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause."Batson at 97. But it must relate to the particular case being tried and be both clear and reasonably specific. Id. at 98, footnote 20. A prosecutor cannot rebut the defendant's assertions of racial discrimination by general assertions of good faith. Id. at 98.
 {¶ 17} When an appellate court reviews a Batson claim, it must avoid combining Batson's second and third steps into one.Purkett at 768. When conducting the second step of Batson,
"the issue is the facial validity of the prosecutor's explanation." Hernandez at 360. "The second step of this process does not demand an explanation that is persuasive, or even plausible." Purkett at 767-768. The persuasiveness of the justification only becomes relevant at the third stage of the analysis. Id. at 768. Accordingly, when "evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." Hernandez at 359. For the purposes of Batson' s second step, it does not matter whether the stated reason applied equally between the preempted jurors and the ones actually seated. See Miller-El v. Cockrell (2003),537 U.S. 322, 342-343.
 {¶ 18} In this case, the State gave a race-neutral reason for peremptorily striking the juror in question: her son and sister had extensive contact with the criminal justice system in Jefferson County and the prosecutor did not believe her assurance that this would not affect her ability to decide the case. Courts have consistently held that this type of reason is a valid race-neutral reason to exercise a preemptive strike against a juror. See State v. Williams, 2nd Dist. No. 19963,2005-Ohio-3172, at ¶ 12; State v. Conner, 8th Dist. No. 84073,2005-Ohio-1971, at ¶ 28; State v. Jones, 9th Dist. No. 22231, 2005-Ohio1-275, at ¶ 31; State v. Dockery, 1st Dist. No. C-000316, 2002-Ohio-0189; State v. Ellis, 7th Dist. No. 00CA39, 2001-Ohio-3443. Thus, the State met its burden under Batson.
 {¶ 19} Harris argues that a careful review of the record shows that the State's race-neutral reason was merely a pretext for purposeful racial discrimination. This issue is "a pure issue of fact, subject to review under a deferential standard."Hernandez at 364. "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson at 98, footnote 21.
 {¶ 20} Harris tries to demonstrate the State purposefully discriminated based on race by pointing to the fact that the State relied in part on the juror's sister's adverse contacts with the criminal justice system, but that the State never asked the juror about her sister at any point during voir dire. He also points out that other prospective, but nonA-frican American, jurors had family members and friends with a criminal record, but that they were not peremptorily struck from the jury pool. Finally, Harris argues that the fact that the State conducted a more extensive voir dire about the death penalty and life sentences with this prospective juror than any of the non African-American prospective jurors shows racial bias.
 {¶ 21} As an initial matter, we note that although Harris' argument on appeal extensively references the jury questionnaires filled out by various prospective jurors, those questionnaires were never made part of the record on appeal. The only information this court can rely upon when reviewing the trial court's decision regarding Harris' Batson claim is that contained in the record. Thus, Harris' references to the jury questionnaires will be disregarded.
 {¶ 22} The juror's responses which support the State's race-neutral reason for peremptorily striking her from the jury pool are not extensive. When the prospective jurors were being asked whether they knew certain witnesses, this juror responded when she heard one name. When asked how she knew this witness, the following dialogue took place:
 {¶ 23} "A: He was a — I don't know if he's a detective or whatever.
 {¶ 24} "Q: Uh-huh.
 {¶ 25} "A: My son was arrested, in trouble and I know the name.
 {¶ 26} "Q: So, he was — he was involved with your son?
 {¶ 27} "A: (Juror nods head).
 {¶ 28} "Q: On a professional basis?
 {¶ 29} "A: Yes."
 {¶ 30} The State later followed up on the prospective juror's response:
 {¶ 31} "Q: Ms. Livingston, the fact that you — you mentioned Jason Hamlin out of all of those names. That was the only one that you had a hit on. The fact — whatever that relationship was with your son, would that cause you to — to weigh his evidence in a manner beyond what the Judge will instruct you on how you — how you were told to — how you were required to evaluate evidence from the witness stand?
 {¶ 32} "A: No, I don't know the man. I don't know him. I just know the name.
 {¶ 33} "Q: You just know the name. So, you haven't judged him or have a basis to do that?
 {¶ 34} "A: No. It's just a job I imagine. I just remember the name."
 {¶ 35} Later on, the State asked the prospective juror about her son.
 {¶ 36} "Q: Moving back to the prosecutor's office, anyone here please tell us if you've had contact, both positive and negative, with the — with my office, that could be either as a witness, as a victim, as you or a member of friend, family have been in a prosecution. And — and the reason we're asking that question again is to see what relationships there are out there. I see Ms. Livingston. Of course you've already mentioned your son. Is that what you are going to talk about?
 {¶ 37} "A: I have such a long list. I thought by the time my — what do you call the thing that you filled out.
 {¶ 38} "Q: Your questionnaire?
 {¶ 39} "A: I thought by the time it was filled out they'd say, `Oh, no, not her.'
 {¶ 40} "Q: Oh, okay. Well, you know, we — we don't do it that way. We certainly do check your questionnaires and I have — and I have that here in front of me but the situation involving your son, is that ongoing or is that — is that in the past?
 {¶ 41} "A: Well, it's not happening now. What — I don't know. Some things I put in the questionnaire that I wouldn't want to just answer in the open court just because it's so in-depth but a short version would be there's in my family just a lot of drug addiction, drug trafficking, that type of thing. So, I know names of police officers, judges, that type of thing like that but I'm not a criminal. So, I mean, whoever I know of it wouldn't have anything to do with me being a fair and impartial juror.
 {¶ 42} "Q: And I recognize some of the names that you — the only one name that — that I see in your questionnaire and I know what you're talking about, ma'am, and we don't need to share all those particulars with your — with the other people here but what is important is given — given those experiences and those relationships and those situations in your life, would — would — do you feel that those impact your ability to be fair and impartial in the case both for the State of Ohio and for the Defendant?
 {¶ 43} "A: I don't understand.
 {¶ 44} "Q: Well, you've — you've got this — these situations that you've experienced and we're going to ask — as I said, we need you to be fair and impartial. Do they cause you to be, let's say, for example, less trusting of the prosecution or less trusting of the police?
 {¶ 45} "A: No. I understand that these are jobs that people do. It's not me.
 {¶ 46} "Q: All right. Good. And do they — do they — on the — on the other hand, do they cause you to be more trusting of the police than — than — or more trusting of a prosecuting — prosecution team?
 {¶ 47} "A: Not anything one way or the other. I understand it to be a job and it's not me. Does that answer —
 {¶ 48} "Q: Yes. It makes perfect sense."
 {¶ 49} Then, when this prospective juror was asked how she felt about the death penalty, she stated that she could put aside her views and follow the instructions given by the judge.
 {¶ 50} After voir dire, the State informed the trial court that it intended to use a peremptory strike against this witness and wished to discuss the matter since the decision to strike would likely raise a Batson objection. The State explained its reason to strike the witness as follows:
 {¶ 51} "Your Honor, both in her testimony and in her questionnaire — juror questionnaire she states and it's — and it's confirmed that her son, Eulis Allen, has been convicted of numerous crimes and Mr. Allen was convicted in 1995 of aggravated trafficking of drugs, four counts. He was given probation, which was later in '98 revoked to 4 to 15 years in prison. Her son was also convicted in 1996 of burglary. Both of those were here in Jefferson County and as recently as 2003 my office convicted him of permitting drug abuse and he was sentenced to jail for that. So that's — that's Eulis Allen, her son, who she did talk to us about.
 {¶ 52} "She didn't talk to us about was also her sister, Shirley Hoover and I don't know if the Court is familiar with the name Shirley Hoover. She's — she's quite well-known in this County. Shirley Hoover has a 20 year record in Muni Court almost monthly. In '95 she was convicted by — of aggravated trafficking and sent to a year-and-a-half in prison and in the year 2000 she was sentenced to another year in prison for drug trafficking. These cases all involved City of Steubenville policemen. They pick her up all the time. She's —
 {¶ 53} "THE COURT: The sister.
 {¶ 54} "MR. FELMET: The sister.
 {¶ 55} "THE COURT: But not this juror.
 {¶ 56} "MR. FELMET: But not this juror and her answers to questions about — about law enforcement, all of that were — we agree, they were pat answers. `I can be fair, I'm law abiding,' on and on and on but based on this family history, we — we feel that her credibility suffers and not just her answers to those questions but who knows how many questions that she answered and that's our basis for exercising not for cause but a peremptory challenge to this individual if she makes it in there and we — we fully anticipate that she will — as she's number 16, at the end of four preempts she's in the box and so we expect her to be there and this is our basis for exercising our peremptory challenge."
 {¶ 57} As proof that the State's race-neutral explanation for excusing the juror was pretextual, Harris first points to the fact that the State did not inquire about her sister at all during the voir dire. However, the reason for this seems plain. It appears that the prospective juror did not identify her sister in her juror questionnaire and did not mention her sister during voir dire. Instead, she only listed and mentioned her son, saying that the rest of her friends and family were "such a long list." The State did not know the full extent of the family's criminal history until after the voir dire with this prospective juror was completed. The fact that the State did not elicit all these facts during voir dire does not show an improper racial motivation for peremptorily challenging this juror.
 {¶ 58} Harris next argues that other prospective jurors also admitted during voir dire that their friends and/or family had been charged with a crime and/or sent to prison, but that the prosecution did not preemptively strike them from the jury. However, all but one of the prospective jurors he identifies were never actually sworn in as jurors in this case. The only prospective juror identified by Harris of having friends or family members with a criminal history in Jefferson County who actually was impaneled had a nephew and some distant cousins who were convicted of unidentified crimes. The trial court could have reasonably distinguished this prospective juror from Ms. Livingston. She clearly identified the friends and family at issue and there is no indication that their criminal history was as extensive as Ms. Livingston's sister and son. Thus, the fact that other members of the venire had friends and family with criminal histories does not show purposeful racial discrimination by the State when it preemptively struck this prospective juror for that reason.
 {¶ 59} Harris' final argument, that he can show purposeful racial discrimination because the State engages in a more lengthy voir dire regarding potential sentences with this prospective juror than other, non African-American prospective jurors, is also meritless. Some of the voir dires on this subject which Harris contrasts with this one were just as lengthy. Furthermore, the trial court was in the best position to judge whether the State was fishing for a pretext to strike this juror, rather than merely engaging in a typical voir dire examination.
 {¶ 60} For all these reasons, we cannot conclude the trial court erred when it concluded that there was no purposeful racial discrimination when the State preemptively struck this prospective juror from the petit jury. Harris' first assignment of error is meritless.
 Expert DNA Testimony {¶ 61} In his second assignment of error, Harris argues:
 {¶ 62} "The trial court erred when it permitted the State to introduce expert testimony regarding forensic DNA tests, the results of which were not reliable, and were confusing and misleading. Evid.R. 702, 403. This error deprived Mr. Harris of his rights to due process and a fair trial, as guaranteed by theFifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution."
 {¶ 63} According to Harris, his expert demonstrated that the testimony provided by the State's experts was unreliable, so those experts' testimony should have been excluded under Evid.R. 702. Harris further believes that he preserved an objection to this error at trial, so this assignment of error is not subject to plain error analysis. We reject each of Harris' arguments.
 {¶ 64} First, Harris did not preserve his objection to the testimony of these two experts, so this assignment of error is subject to plain error analysis. Harris made a number of pretrial motions regarding these experts, but none of those motions argued that the testimony provided by the State's experts was unreliable. Instead, they all were concerned with obtaining a defense expert and providing that expert with the information he needed to either conduct his own DNA tests or review the conclusions reached by the State's experts. At no time did any of those motions hint that the DNA evidence offered by the State should be excluded as unreliable.
 {¶ 65} Moreover, Harris did not object to the experts' testimony as unreliable at any time during trial. Instead, he objected to a piece of information in an expert's report that had not been produced prior to trial and to the admission of certain documents into evidence, documents to which he objected after the witness had already testified and given her expert opinion.
 {¶ 66} We recently held that a criminal defendant's failure to timely object to an expert's testimony as unreliable under Evid.R. 702 waives all but plain error. State v. Singh,157 Ohio App.3d 603, 2004-Ohio-3213, at ¶ 35-36 (Noting that Evid.R. 702 "contemplates objection during trial or presentation in a proffer before trial."), citing State v. Moreland (1990),50 Ohio St.3d 58, 63. Since Harris did not timely raise his current argument to the trial court, he has waived all but plain error with regard to these arguments.
 {¶ 67} Crim.R. 52(B) provides that plain errors "affecting substantial rights may be noticed although they were not brought to the attention of the court." The discretionary decision to correct plain error can take place only where obvious error affected the outcome of the case. State v. Noling,98 Ohio St.3d 44, 2002-Ohio-7044, at ¶ 19. The decision to correct plain error must be made with utmost caution under exceptional circumstances and only to prevent a manifest miscarriage of justice. Id.
 {¶ 68} In this case, the trial court did not plainly err by allowing the State's experts to give their opinions since any error in allowing this testimony was not obvious. Moreover, the Ohio Supreme Court has held that questions regarding the reliability of DNA evidence in a given case go to the weight of the evidence rather than its admissibility and that the jury can determine whether DNA evidence is reliable based on the expert testimony and other evidence presented. State v. Pierce,64 Ohio St.3d 490, 501, 1992-Ohio-0053. Thus, the evidence the State introduced must be so obviously unreliable that no trial judge would have let the jury hear it.
 {¶ 69} Harris states that the State's experts reach unreliable conclusions because the experts did not follow proper scientific protocol. But the testimony Harris relies upon when making this argument was all elicited either on cross-examination of the State's experts, re-direct examination of those experts, or from Harris' expert. There is nothing about the testimony of those experts upon direct examination which would lead a court to conclude that the State's experts did not follow proper scientific protocol.
 {¶ 70} Harris next argues that the testimony is obviously unreliable since the State's two experts contradict each other. Harris, for example, points to the fact that the BCI expert found that the DNA on the duct tape was consistent with, or "matched," Scott Mellinger, while the expert from Cellmark stated that the duct tape contained DNA from at least two individuals, a man and a woman. But these conclusions are not obviously contradictory. A piece of evidence could contain DNA consistent with one person while also containing DNA evidence of a person of the opposite sex. Contrary to Harris' allusion in his brief, the BCI expert did not state that she only found one person's DNA on the duct tape. The other "inconsistencies" Harris lists are similar.
 {¶ 71} Harris also complains that the jury was never given a sufficient explanation of the statistics and science involved in DNA analysis. However, any fault for this lies as much in his hands as in the hands of the State. If his defense counsel believed that eliciting testimony regarding the statistical probability that the DNA tests excluded certain individuals, then they should have elicited this testimony from the State's witnesses on cross-examination. Harris cannot blame the trial court for the failures of his defense counsel, if any failure actually occurred.
 {¶ 72} As the Ohio Supreme Court said in Pierce, "`[w]ith adequate cautionary instructions from the trial judge, vigorous cross-examination of the government's experts, and challenging testimony from defense experts, the jury should be allowed to make its own factual determination as to whether the evidence is reliable.'" Id. at 501, quoting United States v. Jakobetz
(C.A.2, 1992), 955 F.2d 786, 800. There is not any reason to think that the trial court committed plain error by letting the State's two expert witnesses give DNA evidence in this case. Harris' second assignment of error is meritless.
 Non-Scientific Evidence {¶ 73} In his third assignment of error, Harris argues:
 {¶ 74} "The trial court erred when it erroneously admitted other acts evidence, in contravention of Evid.R. 404 and 403; when it erroneously admitted unfairly prejudicial and irrelevant testimony and physical evidence; and when it permitted two witnesses to testify who met and discussed the case during an overnight recess. The cumulative effect of these evidentiary errors deprived Mr. Harris of his right to a fair trial in contravention of the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 16 of the Ohio Constitution."
 {¶ 75} In this assignment of error, Harris contends the trial court erred in a variety of ways when it allowed different evidence to be introduced. He also argues the cumulative result of these errors deprived him of a fair trial. We review a trial court's decision on the admissibility of evidence for an abuse of discretion. State v. Sage (1987), 31 Ohio St.3d 173, at paragraph two of the syllabus. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 158.
 {¶ 76} Pursuant to the doctrine of cumulative error, a conviction will be reversed where the cumulative effect of multiple errors deprives a defendant of her constitutional right to a fair trial, even though each individual error does not constitute cause for reversal. State v. DeMarco (1987),31 Ohio St.3d 191, paragraph two of the syllabus. Nevertheless, a defendant's claim of cumulative error is without merit in instances where prejudicial error is nonexistent. State v.Garner (1995), 74 Ohio St.3d 49, 64, 1995-Ohio-0168; State v.Moreland (1990), 50 Ohio St.3d 58, 69.
 Other Bad Acts Evidence {¶ 77} During the course of the trial, various witnesses referred to Harris as a drug dealer and as someone who physically assaulted women and children. Harris contends this is improper other bad acts evidence under Evid.R. 403 and 404(B), was not offered for any permissible purpose under Evid.R. 404(B) and was unfairly prejudicial to his defense.
 {¶ 78} As a general rule, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." Evid.R. 404(B); State v. Shedrick (1991), 61 Ohio St.3d 331,337. However, both Evid.R. 404(B) and R.C. 2945.59 contain an exception to this general rule. Evidence of other bad acts may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B). Similarly, R.C.2945.59 allows this type of evidence to prove "motive or intent, the absence of mistake or accident on [the defendant's] part, or the defendant's scheme, plan or system in doing an act * * * notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."
 {¶ 79} "Evid.R. 404(B) and R.C. 2945.59 codify an exception to the common law. [State v. Broom (1988), 40 Ohio St.3d 277,281-282, 533 N.E.2d 682, 690]; State v. Burson (1974),38 Ohio St.2d 157, 158-159, 67 O.O.2d 174, 175, 311 N.E.2d 526, 528. In order to be admissible the `other act' evidence must `tend to show,' by substantial proof, the defendant's identity, plan, scheme, or system. Neither the statute nor the rule requires that the other act be `like' or `similar' to the crime charged, as long as the prior act tends to show one of the enumerated factors. Broom, supra, 40 Ohio St.3d at 282, 533 N.E.2d at 690;State v. Flonnory (1972), 31 Ohio St.2d 124, 126, 60 O.O.2d 95, 96-97, 285 N.E.2d 726, 729." Shedrick at 337.
 {¶ 80} The exceptions in Evid.R. 404(B) and R.C. 2945.59 are to be strictly construed against the State and conservatively applied by a trial court. DeMarco at 194; State v. Lowe,69 Ohio St.3d 527, 530, 1994-Ohio-0345. However, the admission of prior bad acts is deemed harmless unless there is some reasonable probability the evidence contributed to the accused's conviction.City of Columbus v. Taylor (1988), 39 Ohio St.3d 162, 166.
 {¶ 81} Harris argues that the State improperly elicited testimony that he was a drug dealer and that this testimony was not elicited for a purpose permitted by the Evid.R. 404(B) and R.C. 2945.59. During the trial, a detective with the Steubenville police department testified that Scott Mellinger would provide the detective with "information about people who he believed were dealing drugs through the City." The detective then testified that he received information about Harris from Scott Mellinger about a week before his murder. In addition, during her testimony, Angela Mellinger testified that Harris supplied Scott Mellinger with drugs. Hayes testified that Harris intended to rob the Mellingers to get money that Scott Mellinger owed him. Finally, another Steubenville detective testified that during the course of his investigation, he discovered that Scott Mellinger was involved with local drug dealers and that he had received death threats. That detective stated Harris became a suspect in Scott Mellinger's death after an investigation.
 {¶ 82} The State referenced the allegation that Harris dealt drugs during his rebuttal closing argument. The State was stating that Harris used a ski mask during the crime to hide his identity from the Mellingers, who both knew him. Then it made the following statements:
 {¶ 83} "And, you know, there was testimony that this is a drug dealer. He dealt drugs to — Scott Mellinger and Angela Mellinger said — she said — she tell — she told the truth and she came in and told the truth. It's not a comfortable truth. It's not a comfortable truth but she told it.
 {¶ 84} "And according to [defense counsel], drug dealers only load their guns once and then you I guess — according to him, you shoot them until they're empty and then you got to go fill them up again because after he shot Scott Mellinger, he wouldn't have reloaded his gun. He just would have left it in the condition it was in when it was found on September 17th, six days later in his house at 817 Sherman."
 {¶ 85} Harris never objected at any time to any of these allusions or references to whether he was a drug dealer, so we review his argument for plain error. State v. Loza (1994),71 Ohio St.3d 61, 75.
 {¶ 86} In this case, the trial court did not obviously err when it allowed this evidence to be introduced. Evidence of the nature of Harris' relationship to the Mellingers could be used to establish a number of the grounds in Evid.R. 404(B) or R.C.2945.59, including motive, preparation, plan, and absence of mistake or accident. Harris' argument that these were never issues in the case misses the point; these issues could have been made an issue in the case if the State had not introduced evidence to the contrary during the course of the trial. When this evidence was introduced, the State could not have been sure exactly what defenses Harris was planning to raise. Thus, it was proper for the trial court to allow this evidence to be introduced.
 {¶ 87} Harris' argument that the State improperly introduced evidence that he physically assaulted women and children is also meritless. The only place in the transcript Harris points to in support of his argument is a portion of Angela Mellinger's testimony to which he did not object. In that portion of her testimony, Angela stated that Harris and her husband had a few problems between them. As an example, she stated that Harris and Scott Mellinger were arguing one night after Harris pushed a little girl down. Mellinger was apparently upset with Harris' temper.
 {¶ 88} Again, it is reasonable to conclude that this evidence was introduced to prove, among other things, motive, intent, or absence of mistake or accident. For instance, this testimony shows that Harris may have been unhappy with Scott Mellinger and purposefully shot him when robbing him that night. Harris' arguments to the contrary are meritless.
 Gun Clip {¶ 89} According to Harris, the trial court erred when it admitted a gun clip recovered from a chair in Harris' home into evidence since "[t]he State never established any connection between the gun clip and either the offense or the offender." Without such a connection, Harris argues the evidence was irrelevant and unfairly prejudicial. We cannot agree. The gun clip was clearly relevant evidence.
 {¶ 90} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In this case, the fact the State was trying to prove was that Harris shot Scott Mellinger. Mellinger was shot with a .45 caliber weapon and a gun clip for a .45 caliber weapon was found at Harris' home. The fact that such a gun clip was found at Harris' home makes it more probable that he shot Scott Mellinger. Thus, Harris' argument that this evidence is irrelevant is meritless.
 {¶ 91} Relevant evidence is presumed to be admissible under Evid.R. 402. Oberlin v. Akron Gen. Med. Ctr.,91 Ohio St.3d 169, 173, 2001-Ohio-0248. Harris seeks to overcome this presumption by arguing that admitting the gun clip was unfairly prejudicial, thereby violating Evid.R. 403(A). Evidence is unfairly prejudicial if it "`might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial.'" Oberlin at 172, quoting Weissenberger's Ohio Evidence (2000) 85-87, Section 403.3.
 {¶ 92} In this case, Harris has failed to show how admitting the gun clip into evidence was unfairly prejudicial. He maintains that the State never proved that the gun clip was used in Scott Mellinger's murder and that the State did not prove that the gun clip was his since it was found in a common area of his home, but these arguments go to the weight the jury should place on this evidence, not its admissibility. We cannot understand how admitting the gun clip was likely to result in an improper basis for a jury decision. Accordingly, Harris' argument that it was improperly admitted into evidence is meritless.
 Yancey George's Appearance {¶ 93} Harris argues the trial court erred by allowing multiple witnesses to testify about Yancey George's basic appearance. According to Harris, this testimony was irrelevant and should have been excluded. However, the testimony showed that George and Harris were both upset with Scott Mellinger when Mellinger was murdered. The testimony showed that George and Harris have very different builds; George is much taller than Harris. The State asked jurors about George's physical appearance to establish that the Mellingers could not have confused George with Harris and, therefore, that this testimony was relevant to show that George did not murder Scott Mellinger. It was important for the State to show the physical difference between these two people so the jury could be sure that Harris, not George, committed the crime. Clearly, this evidence was relevant and Harris' arguments to the contrary are meritless.
 Communication Between Witnesses During Trial {¶ 94} Harris contends the trial court committed plain error when it did not strike the testimony of two witnesses since they met during an overnight recess during the trial. He contends this contravened the trial court's separation of witnesses order and created an appearance of impropriety. Since one of the witnesses was one of the State's key witnesses, Harris maintains that this appearance of impropriety calls the result of his trial into question.
 {¶ 95} Evid.R. 615 gives the trial court the power to exclude prospective witnesses from the courtroom during a hearing. It provides:
 {¶ 96} "(A) Except as provided in division (B) of this rule, at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. An order directing the `exclusion' or `separation' of witnesses or the like, in general terms without specification of other or additional limitations, is effective only to require the exclusion of witnesses from the hearing during the testimony of other witnesses.
 {¶ 97} "(B) This rule does not authorize exclusion of any of the following persons from the hearing:
 {¶ 98} "(1) a party who is a natural person;
 {¶ 99} "(2) an officer or employee of a party that is not a natural person designated as its representative by its attorney;
 {¶ 100} "(3) a person whose presence is shown by a party to be essential to the presentation of the party's cause;
 {¶ 101} "(4) in a criminal proceeding, a victim of the charged offense to the extent that the victim's presence is authorized by statute enacted by the General Assembly. As used in this rule, "victim" has the same meaning as in the provisions of the Ohio Constitution providing rights for victims of crimes." Id.
 {¶ 102} Since Evid.R. 615 states that a separation of witnesses order only requires that the witnesses be excluded from hearing the testimony of other witnesses, a basic separation order does not prevent out-of-court contact between witnesses or between witnesses and third-parties. Commentary to Evid.R. 615. If the trial court does not want the witnesses to have any other type of contact during the proceeding, then it must make that clear. Id.
 {¶ 103} The Ohio Supreme Court has held that issues surrounding the separation of witnesses and sanctions for the failure to comply with a separation order are within the sound discretion of the trial court. State v. Smith (1990),49 Ohio St.3d 137, 142. In order to exclude the testimony of a witness who has violated a separation order, the movant must show 1) that the party calling the witness consented to, connived in, procured, or had knowledge of the witness's disobedience and 2) that the testimony sought to be introduced must be important to the movant such that exclusion of the evidence constitutes prejudicial error. Id.
 {¶ 104} In this case, it appears the parties understood that a separation order was in effect. However, it does not appear that the trial court explicitly ordered that the witnesses be separated. This means that there is no order on the record preventing out-of-court contact between witnesses.
 {¶ 105} During one overnight recess, two witnesses, Harold Hayes and Officer John Stasiulewicz, spoke during an overnight recess during Harris' trial before either of them had testified. Since there was no court order preventing this type of conversation, these witnesses did not violate either a court order or Evid.R. 615.
 {¶ 106} Furthermore, the testimony of these witnesses shows that the conversation had no effect upon their testimony. Hayes testified that Officer Stasiulewicz spoke to him the night before Hayes testified. When asked if the two spoke about Hayes testimony, he answered, "I'm not sure," and that he couldn't remember what they spoke about that day. However, when he was later asked if he was told what to say during his testimony, Hayes responded that Officer Stasiulewicz told him to "Just speak the truth." Defense counsel did not inquire about the substance of the conversation between Hayes and Officer Stasiulewicz from either of these witnesses any further.
 {¶ 107} Finally, the trial court could not have excluded the testimony of these two witnesses under the test the Ohio Supreme Court provided in Smith. While Hayes' testimony was important, since he was Harris' co-conspirator, there is no indication in the record that the State consented to, connived in, procured, or had knowledge that Hayes and Officer Stasiulewicz had this conversation. For all these reasons, the trial court did not plainly err when it did not sua sponte strike the testimony of these two witnesses and Harris' arguments to the contrary are meritless.
 Cumulative Error {¶ 108} In his final argument within this assignment of error, Harris argues that the cumulative effect of all the issues he raises within this assignment of error deprived him of a fair trial. Under the doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal. State v. Garner (1995), 74 Ohio St.3d 49,64. This doctrine is inapplicable when there are not multiple instances of harmless error. Id.
 {¶ 109} In this case, Harris has failed to identify multiple instances of harmless error. He failed to object to many of the issues he raises, so they are subject to harmless error analysis. This means they cannot be used under the doctrine of cumulative error. State v. Hess, 7th Dist. No. 02 JE 36, 2003-Ohio-6721, at ¶ 37. And it appears that the other "errors" he identifies are not, in fact errors.
 {¶ 110} Since Harris has failed to identify multiple instances of harmless error his argument in that regard is meritless.
 Maximum and Consecutive Sentences {¶ 111} In his fourth and fifth assignments of error, Harris argues:
 {¶ 112} "The trial court erred when it imposed maximum, consecutive sentences."
 {¶ 113} "The trial court erred by sentencing Marcus Harris to maximum, consecutive prison terms based on facts not found by the jury or admitted by Harris, in contravention of his rights guaranteed by the Sixth Amendment to the United States Constitution."
 {¶ 114} Our resolution of both of these assignments of error is controlled by the Ohio Supreme Court's recent decision inFoster. In Foster, the Ohio Supreme Court found that R.C.2929.14(C), which applies to maximum sentences, and R.C.2929.14(E)(4), which applies to consecutive sentences, unconstitutionally allowed a trial court to increase a felony offender's sentence beyond the statutory maximum based on facts not found by the jury. Foster at paragraphs one and three of the syllabus. However, the court found that those offending statutes could be severed from the overall felony sentencing structure. Id. at paragraphs two and four of the syllabus. Thus, trial courts now "have full discretion to impose a sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at ¶ 100.
 {¶ 115} After reaching this conclusion, the Ohio Supreme Court decided that any case reversed for these reasons should be remanded for resentencing.
 {¶ 116} "The sentences of Foster, Quinones, and Adams were based on unconstitutional statutes. When a sentence is deemed void, the ordinary course is to vacate that sentence and remand to the trial court for a new sentencing hearing. See, e.g.,State v. Jordan, 104 Ohio St.3d 21, 2004-Ohio-6085,817 N.E.2d 864, ¶ 23 (where a sentence is void because it does not contain a statutorily mandated term, the proper remedy is to resentence the offender). In fact, in the case of Quinones, the court of appeals, whose judgment we today affirm, vacated the sentence and remanded to the trial court for resentencing.
 {¶ 117} "These cases and those pending on direct review must be remanded to trial courts for new sentencing hearings not inconsistent with this opinion. We do not order resentencing lightly. Although new sentencing hearings will impose significant time and resource demands on the trial courts within the counties, causing disruption while cases are pending on appeal, we must follow the dictates of the United States Supreme Court. Ohio's felony sentencing code must protect Sixth Amendment principles as they have been articulated.
 {¶ 118} "Under R.C. 2929.19 as it stands without (B)(2), the defendants are entitled to a new sentencing hearing although the parties may stipulate to the sentencing court acting on the record before it. Courts shall consider those portions of the sentencing code that are unaffected by today's decision and impose any sentence within the appropriate felony range. If an offender is sentenced to multiple prison terms, the court is not barred from requiring those terms to be served consecutively. While the defendants may argue for reductions in their sentences, nothing prevents the state from seeking greater penalties.United States v. DiFrancesco (1980), 449 U.S. 117, 134-136,101 S.Ct. 426, 66 L.Ed.2d 328.
 {¶ 119} "As the Supreme Court mandated in Booker, we must apply this holding to all cases on direct review. Id.,543 U.S. at 268, 125 S.Ct. 738, 160 L.Ed.2d 621, quoting Griffith v.Kentucky, 479 U.S. at 328, 107 S.Ct. 708, 93 L.Ed.2d 649. ("`[a] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases * * * pending on direct review or not yet final'")." Id. at ¶ 103-106.
 {¶ 120} The Ohio Supreme Court followed this decision inFoster's companion case, State v. Mathis, ___ Ohio St.3d ___, 2006-Ohio-0855. In that case, the appellate court ordered the case be remanded for resentencing because the trial court failed to follow the felony sentencing statutes. The Ohio Supreme Court noted that those statutes no longer applied and provided some guidance regarding how courts should deal with appeals after theFoster decision. But most importantly, the Ohio Supreme Court affirmed the appellate court's decision to remand the case for resentencing.
 {¶ 121} Subsequently, the Ohio Supreme Court has affirmed decisions to remand because of Blakely even though the trial courts in those cases failed to make the statutorily required findings. See In re Ohio Criminal Sentencing Statutes Cases,
___ Ohio St.3d ___, 2006-Ohio-2109 (affirming both State v.Baccus, 1st Dist. No. C-040028, 2005-Ohio-3407, and State v.Mason, 8th Dist. No. 84061, 2004-Ohio-5388).
 {¶ 122} The Ohio Supreme Court clearly stated that we must reverse any sentence imposed on a felony offender which violated that offender's right to a jury trial and it followed this decision in Mathis. We have no discretion to disregard the clear mandate of the Ohio Supreme Court. Dougherty v. Torrence
(1984), 10 Ohio St.3d 139, 141. Each of our sister districts have recognized this basic fact and remanded cases for resentencing when Foster concerns are appropriately raised. See State v.Stafford, 1st Dist. No. C-050286, 2006-Ohio-1105, at ¶ 17 (Appellate courts must remand due to Foster, even if they "failto see any rationale for sending the case back for resentencing,[because] that is what the Ohio Supreme Court has instructed usto do."); State v. Bailey, 2nd Dist. No. 20913,2006-Ohio-1124, at ¶ 6 ("[T]he Ohio Supreme Court prescribed the appropriate remedy for all cases pending on direct review as a reversal of the sentence and the remand of the cause for re-sentencing."); State v. McKercher, 3rd Dist. No. 1-058-3,2006-Ohio-1772, at ¶ 5 (Because of Foster, "the sentencesimposed in pending cases and those cases on direct appeal arevoid and must be remanded to the trial courts."); State v.Lincoln, 4th Dist. No. 05CA19, 2006-Ohio-1900, at ¶ 7 ("[T]he proper procedure * * * is to vacate the sentence imposed on Appellant and remand the case [for] a new sentencing hearing.");State v. Hill, 5th Dist. No. 2003-CA-67, 2006-Ohio-1408, at ¶ 56-58 (Case must be remanded for resentencing "as set forth in the Foster decision."); State v. Albelo, 6th Dist. No. L-05-1147, 2006-Ohio-1228, at ¶ 3 (Case must be remanded forresentencing because the trial court relied on anunconstitutional statute.); State v. Spates, 8th Dist. No. 86486, 2006-Ohio-1564, at ¶ 25-26 (Foster requires that appellate courts remand for resentencing.); State v. O'Neal,
9th Dist. No. 05CA0076-M, 2006-Ohio-1904, at ¶ 7 (Foster
requires that unconstitutional sentences be remanded for a new sentencing hearing.); State v. Alexander, 10th Dist. Nos. 05AP-192, 05AP-245, 2006-Ohio-1298, at ¶ 27 (Case must beremanded whether the trial court made the findings on the recordor not.); State v. Seavey, 11th Dist. No. 2005-A-0003,2006-Ohio-1681, at ¶ 6 (Because of Foster, "appellant's sentence is void and must be remanded to the trial court for a new sentencing hearing."); State v. Hooks, 12th Dist. Nos. CA2004-02-047, CA2004-02-050, CA2004-02-051, 2006-Ohio-1272, at ¶ 9 (Foster applies to all cases pending on direct review and requires that appellate courts remand for resentencing.).
 {¶ 123} In this case, the trial court followed the dictates of R.C. 2929.14(C) and (E)(4) when sentencing Harris. Accordingly, his sentence violated his Sixth Amendment right to a trial by jury and this case must be remanded for resentencing pursuant to the Ohio Supreme Court's mandate in Foster.
 Multiple Firearm Specifications {¶ 124} In his sixth assignment of error, Harris argues
 {¶ 125} "The trial court erred in imposing multiple consecutive prison terms for each firearm specification since all the felony convictions and the accompanying specifications occurred as part of the same act or transaction."
 {¶ 126} R.C. 2929.14(D)(1)(a)(ii) allows a trial court to impose a three year prison term if the jury finds that "the offender [had] a firearm that is an automatic firearm or that was equipped with a firearm muffler or silencer on or about the offender's person or under the offender's control while committing the felony." However, the Revised Code limits a trial court's ability to order that multiple firearm specifications in a single case be served consecutively. "A court shall not impose more than one prison term on an offender under division (D)(1)(a) of this section for felonies committed as part of the same act or transaction." R.C. 2929.14(D)(1)(b).
 {¶ 127} In order to determine whether the offender's felony convictions were part of the same act or transaction, the trial court must determine whether those felonies are "`a series of continuous acts bound together by time, space and purpose, and directed toward a single objective.' * * * If there was singleness of purpose, the courts have held that merger of the firearm specifications is required." State v. Bunch, 7th Dist. No. 02 CA 196, 2005-Ohio-3309, at ¶ 229 quoting State v. Wills,69 Ohio St.3d 690, 691, 1994-Ohio-0417. It is important to note that felonies which are not part of the same transaction for the purposes of R.C. 2941.25 (involving multiple counts) can be part of the same transaction for the purposes of R.C.2929.14(D)(1)(b). State v. Washington (June 8, 2000), 10th Dist. No. 99AP-640, at 9.
 {¶ 128} In this case, Harris and Hayes forced their way into the Mellinger's residence with the intention of robbing them. Once inside, Hayes forced Angela's son, Jordan, to the ground by gunpoint while Harris entered the master bedroom and pointed his firearm at Scott and Angela. Scott then began wrestling with Harris so Angela could call the police. As Angela could hear the sounds of sirens, Harris shot Scott, then he and Hayes fled.
 {¶ 129} Besides the one count of aggravated murder, Harris was convicted of kidnapping, aggravated burglary, aggravated robbery, and felonious assault. Each of these crimes occurred during the same act or transaction. They all occurred at the same time, in the same location, with the underlying purpose of taking money from the Mellingers.
 {¶ 130} In many ways, this situation is similar to the one the First District faced in State v. Hill, 1st Dist. No. C-020137, 2002-Ohio-7079. In that case, the defendant and an accomplice entered a jewelry store, ordered those present into a back room at gunpoint, and stole jewelry from some display cases. The defendant was convicted of aggravated robbery and kidnapping, each of which contained firearm specifications. The appellate court held the trial court erred when it ordered that the firearm specification prison terms be served consecutively.
 {¶ 131} "Here, Hill committed the kidnappings and aggravated robbery in one continuous sequence of events. The offenses occurred simultaneously and clearly developed from a single criminal adventure. All the felonies were part of the same transaction within the meaning R.C. 2929.14(D)(1)(b). Therefore, Hill should have been sentenced to only one three-year term of actual incarceration." Id. at ¶ 7.
 {¶ 132} Similarly, in State v. Blackman, 6th Dist. No. L-01-1349, 2003-Ohio-2216, the defendant robbed a convenience store at gunpoint and fired his weapon at the police officers chasing his vehicle. The defendant was later convicted of aggravated robbery, felonious assault toward the convenience store clerk, and felonious assaults toward various police officers. The appellate court held that the firearm specifications for the aggravated robbery and the felonious assault toward the convenience store clerk were part of the same transaction since they occurred at the same time, in the same location and were directed toward a single objective. Id. at ¶ 21.
 {¶ 133} In this case, each of the firearm specifications is related to felonies which occurred at the same time, in the same location, and were directed to the same object, taking money from the Mellingers. Thus, they occurred during the same transaction and the trial court erred by ordering that they all be served consecutively. Harris' sixth assignment of error is meritorious.
 Conclusion {¶ 134} Harris' arguments regarding any error in his trial are meritless. However, the trial court erred when it sentenced Harris. Each of Harris' firearm specifications are related to a felonies which occurred at the same time, in the same location, and were directed to the same object, so they must be served concurrently. Furthermore, the trial court violated Harris' right to a jury trial when it sentenced Harris to maximum, consecutive sentences. Accordingly, Harris' sentence is modified to reflect that his firearm specifications will be served concurrently and, pursuant to the Ohio Supreme Court's directive in Foster, the remainder of Harris' sentence is vacated and this cause is remanded to the trial court for resentencing.
Donofrio, P.J., concurs.
Vukovich, J., concurs.